Mary Joyce SMITH, Appellant,

v.

SWICK & SHAPIRO, P.C., Appellee.

No. 11–CV–1625.

District of Columbia Court of Appeals.

Argued Dec. 12, 2012.
Decided Sept. 5, 2013.

Christopher G. Hoge, Washington, DC, with whom Elena Iuga was on the brief, for appellant.

Laura M.K. Hassler, with whom Aaron Handleman, Hanover, was on the brief, for appellee.

Before WASHINGTON, Chief Judge, and BECKWITH, Associate Judge, and REID, Senior Judge.

REID, Senior Judge:

This case involves a legal malpractice action filed by appellant, Mary Joyce Smith, against appellee, Swick & Shapiro, P.C. ("S & S"), the law firm that represented Ms. Smith in a claim against her former employer, the Federal Deposit Insurance Corporation ("FDIC"), after she was separated from FDIC during a reduction in force ("RIF"). Ms. Smith challenges the trial court's order granting summary judgment to S & S. We conclude that (1) there are no genuine issues of material fact that precluded summary judgment, and (2) Ms. Smith did not present sufficient evidence to prevail on the third prong (proximate cause) of her legal malpractice action. Therefore, we affirm the trial court's judgment.

## FACTUAL SUMMARY

The record reveals that the FDIC notified Ms. Smith, a resolutions and receiverships non-supervisory specialist in the Division of Resolutions and Receiverships ("DRR"), that as a result of its RIF procedures, she would be separated from employment effective September 3, 2005, because "[she did] not have an assignment right to another position in the competitive area." At that time, Ms. Smith was fifty years of age and had been a government employee for over twenty-nine years. Within the FDIC, she had advanced from a grade 12 bank examiner's position in 1980 to her then current grade CG–15 position.

Ms. Smith filed a complaint against the FDIC on September 6, 2005, claiming she was "terminated through improper RIF procedures and/or terminated on the basis of race, gender, age." [1] Approximately one month later, she retained S & S to represent her before the FDIC. The FDIC denied her claims on May 1, 2007, and sent its decision to David Shapiro, Esq. of S & S on the same day. The FDIC specifically indicated that Ms. Smith had a thirty-day period in which to file an appeal, either with the Merit Systems Protection Board ("MSPB") or the federal district court. Although Mr. Shapiro left Ms. Smith a voice mail message on May 30, 2007, indicating that he was working on a complaint to be filed in federal court, S & S failed to file an appeal within the thirty-day period, and did not notify Ms. Smith about its failure until approximately five months later.

Subsequently, Ms. Smith filed a legal malpractice action against S & S in the Superior Court of the District of Columbia, on May 28, 2010. Following discovery, S & S lodged a motion for summary judgment, contending in essence that Ms. Smith would not have prevailed on her appeal had it been filed. S & S supported its motion with various exhibits, including documents and affidavits. Ms. Smith opposed S & S's summary judgment motion and attached supporting documents and affidavits. S & S submitted a reply to the opposition.

The Honorable Craig Iscoe, trial judge, issued a detailed twenty-four page order on November 10, 2011. He traced the history of Ms. Smith's complaint against S & S, and he analyzed whether an appeal from the FDIC decision would have been successful, both with respect to her discrimination and RIF claims. Because the FDIC found that Ms. Smith had established "a prima facie case of race, color, and gender discrimination," and because she "concede[d] that the FDIC articulated some legitimate nondiscriminatory reasons for [FDIC's] rejection" of her claims, Judge Iscoe concluded that the key issue was "whether [Ms. Smith] has introduced sufficient evidence of pretext [by the FDIC] on her race, color, and gender discrimination claims."

After reviewing the arguments made and exhibits submitted by S & S and Ms. Smith, the trial court declared that Ms. Smith had not substantiated her claims of pretext; there was no genuine issue of material fact for trial; and the FDIC's RIF was economically motivated and prompted by a decision to move the DRR from a generalist environment to a specialized environment, with employees who had subject matter expertise. Furthermore, Judge Iscoe considered Ms. Smith's arguments regarding the FDIC's RIF procedures, including her assertion that not all

---

1. RIF regulations for federal agencies are codified in 5 C.F.R. Part 351. FDIC's RIF procedures mirror those in 5 C.F.R. Part 351; they appear in FDIC Circular 2100.4, Corporate Reduction in Force Policy, adopted on December 23, 1996, and amended on February 24, 2003.

of the positions in her competitive level had been abolished, and her contention that she should have received a position in round two of the RIF competition due to her tenure ranking and her "bump" and "retreat" rights, as outlined in the FDIC's Circular 2100.4, and federal regulations at 5 C.F.R. § 351. He determined that her first assertion was based on her own affidavit that not only contained "conclusory" statements, but also was "insufficient for purposes of establishing that the FDIC's proffered reasons [for her separation] are false and its motives discriminatory." Moreover, the evidence submitted did not support Ms. Smith's allegations that the FDIC "manipulated" position descriptions "to protect favored employees." Nor could a court "infer discrimination absent a showing that [Ms. Smith's] qualifications were far superior to those of the selectees ....," that is, employees retained during the RIF proceeding. In addition, after examining the evidence, Judge Iscoe stated that "bumping" was not an option for Ms. Smith, and that her "retreat" into positions occupied by two retained employees (with lower retention standing) within the same tenure group was not possible, because the positions no longer were " 'the same as, or essentially identical to' the position previously held by [Ms. Smith]." For these and other reasons, the trial court granted S & S's motion for summary judgment.

## ANALYSIS

Ms. Smith first contends that the trial court improperly "resolved all factual issues," and "improperly resolved all factual inferences in favor of the moving party." Specifically, she asserts that the trial court "relied entirely on the statements and representations of the FDIC managers, ... credited the managers' statements and completely discredited the affidavits and exhibits of [a]ppellant and her witnesses." She sets forth examples of factual disputes

she believes the trial court improperly resolved. She also identifies instances in which the trial court allegedly drew factual inferences in favor of the moving party, such as "whether the RIF was implemented in order to reorganize the DRR into a more specialized environment, or whether the DRR remained a generalist environment." She states that the trial court improperly weighed the evidence regarding her qualifications. In response, S & S supports the trial court's judgment, and maintains that Ms. Smith "produced no competent evidence to support her position, there was no genuine issue of material fact, and the [trial] [c]ourt properly found that [S & S] was entitled to judgment as a matter of law."

### Standard of Review and Applicable Legal Principles

Before analyzing Ms. Smith's first contention, we articulate our standard of review, as well as other applicable legal principles. "We review a grant of summary judgment *de novo*, viewing the facts in the light most favorable to the non-moving party." *Aziken v. District of Columbia*, 70 A.3d 213, 218 (D.C.2013) (internal quotation marks omitted) (quoting *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C.2013)). "Summary judgment is appropriate only when there are no material facts in issue and when it is clear that the moving party is entitled to judgment as a matter of law." *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C.2012) (internal quotation marks and citation omitted). "If a moving defendant has made an initial showing that the record presents no genuine issue of material fact, then the burden shifts to the plaintiff to show such an issue exists." *Id.* (internal quotation marks and citation omitted). "The non-moving party cannot meet that burden and avoid summary judgment merely by impugning [the] honesty of the moving party's witness[es]." *Id.* (internal quotation marks and citations omitted). Moreover,

"[a] plaintiff cannot stave off the entry of summary judgment through [m]ere conclusory allegations." *Aziken, supra,* 70 A.3d at 218 (internal quotation marks and citations omitted); *see also McFarland v. George Washington Univ.,* 935 A.2d 337, 345 (D.C.2007) (citation omitted). And, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to defeat a motion for summary judgment." *Aziken, supra,* 70 A.3d at 218 (internal quotation marks and citation omitted).

■ To prevail on a legal malpractice action, Ms. Smith must establish that (1) S & S "was employed as [her] attorney, (2) [S & S] breached a reasonable duty, and (3) that breach resulted in, and was the proximate cause of, [Ms. Smith's] loss or damages." *Martin v. Ross,* 6 A.3d 860, 862 (D.C.2010) (citing *Niosi v. Aiello,* 69 A.2d 57, 60 (D.C.1949)); *see also Chase v. Gilbert,* 499 A.2d 1203, 1211 (D.C.1985).

■ In an employment discrimination case, after an employee has established a *prima facie* case, thus creating a "rebuttable presumption that the employer's conduct amounted to unlawful discrimination[,] the burden of production, not persuasion, shifts to the employer." *Cain v. Reinoso,* 43 A.3d 302, 306 (D.C.2012) (internal quotation marks and citation omitted). The employer can "satisfy its burden by producing admissible evidence from which the trier of fact [could] rationally conclude that the employment action [was not] motivated by discriminatory animus but, rather, reflected a legitimate, nondiscriminatory reason for its action." *Id.* (internal quotation marks omitted). Once the employer's burden is satisfied, "the presumption of discrimination raised by the employee's *prima facie* showing is rebutted and drops from the case." *Id.* (internal quotation marks and citation omitted). The employee then must present evidence showing that the employer's reason is a pretext, that is, "a disguise for discrimination"; this burden "merges with the [employee's] ultimate burden of persuasion on the question of intentional discrimination," a burden which "remains at all times with the plaintiff." *Id.* at 307.

### Did Genuine Issues of Material Fact Preclude Summary Judgment ?

■ With respect to Ms. Smith's first contention, the question we confront is not whether there were disputed issues of fact that foreclosed summary judgment; rather the precise question is does the record present a "genuine issue of material fact" that precludes summary judgment. *Bradshaw, supra,* 43 A.3d at 323. We approach this question in the light most favorable to Ms. Smith, the non-moving party. *Aziken, supra,* 70 A.3d at 218. We also bear in mind that the underlying issue, relative to the third (proximate cause) prong of a legal malpractice action, concerns Ms. Smith's claim against the FDIC for alleged improper application of its RIF procedures and discrimination against her on the basis of race, gender, and age.

The record reveals that as a career appointee, Ms. Smith was placed in the highest ranking tenure group with regard to her competitive area, Group I, due to her service computation date of June 14, 1976; however, at the competitive level, she was placed in tenure subgroup B (for persons who were non-preference eligible), rather than in either subgroup AD or A (persons who were preference eligible).[2] She received annual performance ratings of

---

**2.** Under federal RIF procedures, retention standing is based upon competitive areas, competitive levels, and an employee's resulting position on retention registers. An agency must "establish competitive areas in which employees compete for retention"; a competitive area is "defined ... in terms of the agency's organizational unit(s) and geographical location." 5 C.F.R. § 351.402(a) and (b);

"Pass" for the years 2002, 2003, and 2004. Two affidavits submitted with her opposition to the summary judgment motion described her work performance in glowing terms. Todah Destiny Reed, a former Senior Administrative Officer with the FDIC, DRR, until her retirement in 2005, characterized Ms. Smith as "a very competent and thorough employee who was performing a wide variety of tasks in her position." George Turrentine, a former Associate Director of Administration, DRR, regarded Ms. Smith, who was his Special Assistant from 1995 to 1998, as an "extremely gifted and focused employee, who was very meticulous in her work." Two of DRR's managers who were involved with the RIF process had recommended Ms. Smith for participation in the Corporate Internal Job Rotation Program and had highlighted her strengths, including her "managerial and analytical skills," and her management of "large projects for the sale of complex financial assets."

In addition to evidence about her tenure and job performance, Ms. Smith presented her own affidavit to demonstrate the existence of a genuine issue of material fact concerning whether DRR moved from a generalist environment to a specialized environment. Her theory was that DRR retained a generalist environment and FDIC improperly administered the RIF process, claiming it required employees with specialized knowledge even though it did not change the generalist environment; hence FDIC's alleged reliance on a specialized environment in selecting employees to be retained was a pretext for discrimination against her. She stated, in part: "From my experience and observation, the FDIC's operational business model was always a generalized concept, and not a specialized one, both before and after the 2005 RIF." To support this statement, she mentioned "the fact that in 2011, six years after the 2005[RIF], an estimated 95% or more of FDIC job postings are advertised

FDIC Circular 2100.4, §§ II–3 and VI. In addition, an agency must "establish competitive levels consisting of all positions in a competitive area which are in the same grade (or occupational level) and classification series, and which are similar enough in duties, qualification requirements, pay schedules, and working conditions so that an agency may reassign the incumbent of one position to any of the other positions in the level without undue interruption." 5 C.F.R. § 351.403(a)(1); FDIC Circular 2100.4, §§ II–4, VI. Whether an employee will be separated from service during a RIF depends upon the employee's position on a retention register with respect to tenure group and subgroup. 5 C.F.R. § 351.501(a). There are three tenure groups—group I, group II, and group III. Tenure group I, into which Ms. Smith falls, is comprised of career employees, arranged according to tenure. 5 C.F.R. § 351.501(b); FDIC Circular 2100.4 § VI. There are three subgroups based on preference eligibility—subgroup AD "which includes each preference eligible employee who has a compensable service-connected disability of 30 percent or more," subgroup A which

"includes each preference eligible employee not included in subgroup AD," and subgroup B which "includes each nonpreference eligible employee." 5 C.F.R. § 351.501(c)(1), (2), and (3); FDIC Circular 2100.4, §§ II–5, VI. FDIC "[e]mployees first compete to remain in their competitive level." FDIC Circular 2100.4, § II–7. If an employee is released from the competitive level, she "will be assigned to another competitive level according to bump or retreat rights, as applicable." An "employee will bump into a position held by another employee in a lower tenure group, or in a lower veteran subgroup within the same tenure group," but "[a]n employee cannot displace another employee in the same tenure group and subgroup by bumping." An employee in tenure Group I "will retreat into a position held by another employee with a lower retention standing in the same tenure group and subgroup ...," but "[i]n order to retreat, the position must be the same as, or essentially identical to, a position previously held by the released employee in the Federal Service on a permanent basis." FDIC Circular 2100.4, § II–8.

as 'Resolutions and Receiverships Specialist' positions and filled accordingly."

Ms. Smith's affidavit is replete with "conclusory" statements, and although they may present a "scintilla of evidence," such statements are "insufficient to defeat a motion for summary judgment." *Aziken, supra,* 70 A.3d at 218 (internal quotation marks omitted). The one and one half page affidavit submitted by Ms. Reed contains a similar "conclusory" statement: "[The] generalist system did not change before, during or after the 2005 RIF," and "[o]rganizational charts for the DRR after the 2005 RIF showed that most positions were titled Resolutions and Receiverships Specialist, and were occupied not by specialist[s], but by people who had more generalized skills, such as Ms. Smith." Ms. Smith also included with her opposition to S & S's summary judgment motion job announcements issued in 2011 bearing the title "Resolutions & Receiverships Specialist," but the actual position description pertaining to these jobs was not attached.

██ Without proof analyzing the position descriptions before and after the RIF, DRR's retention of the title, Resolutions and Receiverships Specialists, does not prove that employees were not retained on the basis of specialized knowledge. In short, when viewed in the light most favorable to Ms. Smith, like the trial judge, we are not persuaded that the exhibits she submitted, in opposition to S & S's initial showing that no genuine issue of material fact existed, were sufficient to sustain her burden. The conclusory statements she introduced through her affidavit and that of Ms. Reed, and the "prospect of challenging ... [the] credibility [of witnesses presented by S & S] [are] not alone enough to avoid summary judgment." *McFarland, supra,* 935 A.2d at 345; *Bradshaw, supra,* 43 A.3d at 323 (quoting *Dugan v. Smerwick Sewerage Co.,* 142 F.3d 398, 406 (7th Cir.1998)) (internal quotation marks omitted).

S & S's proof supports our conclusion. In contrast with Ms. Smith's presentation, S & S had submitted its extensive Report of Investigation ("ROI") regarding Ms. Smith's complaint. The ROI was supported by documentary proof and testimonial proof reflected in several affidavits showing that, contrary to Ms. Smith's and Ms. Reed's conclusory statements in their affidavits, no genuine issue of material fact existed as to the FDIC's rationale for the RIF and its determination to implement its plans for a specialized environment.

FDIC's Director of DRR, Mitchell L. Glassman, sent a memorandum to John F. Bovenzi, the Chief Operating Officer and Deputy to the Chairman, on October 25, 2004, concerning the forthcoming DRR reorganization. That memorandum disproves Ms. Smith's identification of the following as a genuine issue of material fact: "The FDIC's operational business model was always a generalized concept, and not a specialized one, both before and after the 2005 RIF." The Glassman memorandum states that the FDIC's goal was to "reduc[e] staff and ensur[e] [that] its mission responsibilities are met through the retention of skilled leaders and knowledgeable personnel." Moreover, "[k]ey specialized positions will be established to capture essential knowledge and skills and equip the [DRR] with the talent it needs to complete its work successfully and effectively under its new business model."

The Lead Human Resources Specialist assigned to the DRR RIF was Pamela K. Mergen, who had been employed by the FDIC for two years. She was the technical advisor regarding the RIF, and assisted in the implementation of the RIF process. She provided an affidavit in response to investigative questions during the investigation of Ms. Smith's com-

plaint. She confirmed that "DRR made a business decision to reorganize and move from a generalized environment to more specialized work as a result of a changed financial environment and the need to reduce the number of employees due to a lack of work."

Ms. Mergen's affidavit also rebutted Ms. Smith's identification of another alleged genuine issue of material fact, that is, that "FDIC management manipulated the RIF process to ensure that favored personnel continued their employment, despite their lower retention standings." Ms. Mergen explained that "[a]ll positions in [Ms. Smith's] competitive level were abolished," and she provided details about the Round 2 competition where Ms. Smith "was considered for vacant and occupied positions in competitive levels different from her own." She described how referral rosters were created based upon tenure and subgroup ranking, the application of "bump" and "retreat" rights, and the review of selection and placement decisions by the Human Resources Branch ("HRB") "to ensure that they were in accordance with RIF regulations."

The referral rosters were sent to the DRR management officials for selection of persons to be retained, and Ms. Mergen detailed the process for documenting the reasons for selecting each retained employee. She attested to the fact that the DRR managers adhered to the RIF rules, declaring: "The selecting official(s) followed RIF rules and applied a systematic process in selecting employees with the best skill set match for available vacant positions. HRB fully reviewed their work for compliance with applicable policies and regulations."

S & S's proof included documents provided by Gail Patelunas, Mr. Glassman and James Wigand, the three DRR managers who served as selection officials during the RIF. Ms. Patelunas, Deputy Director of DRR, affirmed the technical role played by HRB during the selection process, indicating the presence of HRB staff as the selecting officials "went through the roster of eligible applicants." The selecting team determined which of the employees on the referral roster had "the best skill set for the new positions and provided written justification for each of [their] selections." In her supplemental affidavit, Ms. Patelunas stated that "[t]he order in which occupied positions were filled through bump or retreat rights was based on employees' retention order standing within a subgroup."

James Wigand, Deputy Director, DRR, emphasized in his affidavit that the DRR had been reducing employees since "the end of the banking and thrift crisis in 1992" and had moved from "roughly 15,000 employees" to 239 remaining positions. Because "[t]here was a lack of work at the non-supervisory level of the CG–15 grade," he "made the determination that all non-supervisory CG–15 positions, which were legacy positions from the banking and thrift crisis years, would be surplus." He assisted in "planning and developing the new business model for [DRR]." He and the other selecting team members reviewed "all the written records, especially employee statements of qualifications and skills, [and] had Human Resources staff double check for any relevant documents." Once a selection was made for a position, the team "reviewed the skills of all the non-selections on the roster to ensure that [they] had selected the best qualified candidate," and they recorded "the reasons" for the selection.

Mr. Glassman not only provided an affidavit during the investigation of Ms. Smith's complaint, but he also submitted his "Candidate Selection Justification" forms. He pointed out that many positions, including Ms. Smith's position, "were

determined to be surplus," and the FDIC "reduced [its] staff complement by 53%" during the RIF." He and his deputy directors, working together with the Division of Administration, "wrote new position descriptions to reflect duties following the reorganization," and they "selected employees who had the best skill set match for these new positions, from registers provided by the DOA."

Furthermore, based upon our *de novo* review, we see no reasonable inference that the DRR managers "manipulated" the RIF process so that "favored personnel" would continue to work at the agency. Nothing in the record before us, even hints or innuendos, reveals any effort on the part of the DRR managers to manipulate the RIF process for the purpose of retaining favored employees.

***Did the Trial Court Improperly Resolve Factual and Legal Issues Regarding Ms. Smith's Qualifications and the Pretext Question?***

Ms. Smith further complains that the trial court improperly weighed the evidence "on the issue of whether [her] qualifications were superior to the selectees', and whether the FDIC misjudged [her] credentials"; and that the court "improperly resolved factual disputes against [her]" by "finding[ ]" that she "was not better qualified than the selectees" and that "she had to prove she was better qualified in order to prevail." She also maintains that the trial court "determined a legal issue erroneously as a matter of law" (that is, concluding that she had to prove that she was better qualified than the other selectees in order to prevail on her discrimination claim).

We believe that Ms. Smith misinterprets the trial court's legal analysis of the pretext issue relating to her discrimination claim. In her opposition to S & S's summary judgment motion, Ms. Smith argued, in part, that her "extensive knowledge of the DRR's operations and the depth, breadth and longevity of her experience in various FDIC divisions far outweighed those of many of the individuals ultimately chosen." She listed this statement as a "material fact[ ] as to which there are no genuine issues." Judge Iscoe undoubtedly understood the emphasis on her qualifications to reflect Ms. Smith's argument that discrimination through pretext could be inferred from her non-selection during the RIF process. Judge Iscoe stated: "A court cannot infer discrimination absent a showing that Plaintiff's qualifications were far superior to those of the selectees because a court must respect an employer's discretion to choose among qualified candidates." He concluded that Ms. Smith "cannot produce evidence demonstrating that her qualifications were far superior to the selectees or that the FDIC misjudged her credentials."

■ We do not agree that Judge Iscoe improperly weighed the evidence, or improperly resolved "factual disputes" against Ms. Smith, or made an error of law in discussing whether she had presented sufficient evidence of pretext based on "far superior qualifications" in the underlying FDIC case to allow her legal malpractice action to proceed to the jury stage. "[Q]ualifications evidence may suffice, at least in some circumstances, to show pretext." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006) (citations omitted). The Supreme Court has not articulated what "precise [. . .] standard should govern pretext claims based on superior qualifications"; it has only rejected the following statement: "Pretext can be established through comparing qualifications only when the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face." *Id.* at 456–57, 458, 126 S.Ct. 1195 (internal quotation and citation omit-

ted). However, following *Ash*, the District of Columbia Circuit reiterated the principle applied in *Aka v. Washington Hosp. Ctr.*, 332 U.S.App.D.C. 256, 156 F.3d 1284 (1998), one of the cases on which Judge Iscoe relied in discussing the pretext issue and Ms. Smith's qualifications. After stating the *Aka* principle, the circuit refined the qualifications standard to be used in pretext cases by declaring, "a disparity in qualifications, standing alone, can support an inference of discrimination only when the qualifications gap is 'great enough to be inherently indicative of discrimination'—that is, when the plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified' than the successful candidate." *Hamilton v. Geithner*, 399 U.S.App.D.C. 77, 85, 666 F.3d 1344, 1352 (2012) (citing *Holcomb v. Powell*, 369 U.S.App.D.C. 122, 130, 433 F.3d 889, 897 (2006)). Based on *Ash* and *Hamilton*, we cannot say that Judge Iscoe's use of the term "far superior" in his pretext analysis was erroneous as a matter of law; that term is similar to the ones articulated in *Hamilton, supra*. Moreover, Judge Iscoe also relied on *Tolson v. James*, 315 F.Supp.2d 110 (D.D.C.2004), which used the term "clearly superior," as an analytical term. *Id.* at 116. Nor can we agree that Judge Iscoe improperly weighed the evidence or resolved factual disputes relating to Ms. Smith's qualifications in comparison with those of the selectees.

Our review of the record persuades us that Ms. Smith did not present sufficient evidence to rebut the DRR's legitimate and nondiscriminatory reasons for its selections; that is, her evidence was insufficient to show that in a specialized environment, her qualifications were far superior or clearly superior to those of the employ-

ees retained during the RIF, or that she was substantially more qualified than the selected employees. *Hamilton, supra,* 399 U.S.App.D.C. at 85, 666 F.3d at 1352; *Tolson, supra,* 315 F.Supp.2d at 116. Ms. Smith was required to "show *both* that the [legitimate non-discriminatory] reason was false, *and* that discrimination was the real reason" for not retaining her as an employee. *Futrell v. Department of Labor Fed. Credit Union*, 816 A.2d 793, 805 (D.C. 2003) (emphasis in original) (internal quotation marks and citation omitted). Her evidence did not establish that the DRR's reason, the transition from a generalist to a specialized environment, was false; nor did it show that discrimination was the real reason she was not retained.

The FDIC's final agency decision listed the twenty-five positions for which employees were retained, and generally described the reason for each selection, with a comment on why Ms. Smith was not selected for the particular position.[3] For example, FDIC had addressed two selections that Ms. Smith later singled out in her opposition to the summary judgment motion, Selectee "C" and Selectee "E." FDIC remarked that the person chosen for the second Manager, Capital Markets and Resolutions position (Selectee C) had "ten (10) years of recent, directly related and continuous experience" whereas Ms. Smith "had less than four (4) years of experience." The employee selected for the Manager, Risk Analysis position "had approximately twenty-five (25) years of experience in financial analysis related work," and "[w]hile [Ms. Smith] had some experience in financial analysis, she did not have the same depth of experience as the selectee." Mr. Glassman's "Candidate Selection Justification" forms for Selectees "C"

---

**3.** The list of retained employees included 6 white females, 1 black male, 1 black female, 1 Hispanic male, and 1 Asian American female.

and "E" explain why these candidates were selected. We see no evidence that Judge Iscoe improperly weighed the evidence or resolved factual disputes pertaining to Ms. Smith's qualifications.

In sum, with respect to Ms. Smith's first contention, we conclude that even when the record is viewed in the light most favorable to her, (1) she presented insufficient evidence to show that genuine issues of material fact existed regarding (a) the DRR's transition from a generalist to a specialized environment, (b) the DRR's alleged manipulation of the RIF process, and (c) Ms. Smith's qualifications compared with those of retained employees; (2) the trial court did not improperly make credibility determinations or weigh the evidence. We are satisfied that there is no genuine issue of material fact regarding the integrity and fairness of the FDIC's RIF process and decisions by the DRR's managers during the selection of employees for retention. *See Aliotta v. Bair*, 392 U.S.App.D.C. 239, 614 F.3d 556 (2010) (affirming the grant of summary judgment in favor of the FDIC in an age discrimination class action filed by the DRR employees who were separated during the 2005 RIF). Given the dramatic reduction of the DRR employees, from 15,000 in the 1990s to less than 300 at the time of the 2005 RIF, and in light of the 53% reduction in DRR employees during the RIF, it was inevitable that even employees of Ms. Smith's caliber would be separated from service. Furthermore, we conclude the trial court did not err in its legal analysis of the pretext issue. Ms. Smith did not present sufficient evidence showing that the legitimate, nondiscriminatory reason the DRR articulated for her non-selection during the RIF process was pretextual, because her qualifications were far superior to those of retained employees, or that she was substantially more qualified than the selected employees. Nor do we see anything in the record that reflects discriminatory motives or actions against Ms. Smith by the DRR managers because of her race, gender, or age.

***Did the Alleged Conflict Between Expert Opinions Prevent Summary Judgment?***

We turn to Ms. Smith's contention that summary judgment was inappropriate because of a conflict between her expert's testimony and that of S & S's expert. She argues that her expert, George M. Chuzi, "is a highly qualified expert in the area of employment law litigation"; he opines that S & S breached the standard of care it owed to Ms. Smith by missing the filing deadline for an appeal of the FDIC's RIF decision; and the "breach of the standard of care proximately caused damage" to her. She insists that the opinion testimony "is sufficient to raise a genuine issue of material fact and prohibit summary judgment." She also maintains that the trial court incorrectly interpreted the FDIC's RIF regulations, and that Mr. Chuzi's interpretation of the FDIC's RIF regulations "is more internally consistent in the context of the entire RIF process and should be granted more weight than that given by Ms. Mergen, an employee of the FDIC and therefore an interested party."

S & S responds that Ms. Smith "was required to prove causation by putting on the underlying case, not by simply calling an expert to opine on how it would be resolved." S & S also contends that "issues that present legal questions in the underlying litigation[ ] remain issues of law to be decided by the court," and that "Judge Iscoe properly found that the FDIC's interpretation [of its RIF regulations] was reasonable and consistent."

We first agree that questions of law are for the court. Second, courts "have long recognized that considerable weight should be accorded to an executive department's construction of a statutory

scheme it is entrusted to administer, and the principle of deference to administrative interpretations has been consistently followed ...." *Chevron, USA Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (internal quotation marks and citations omitted). The trial court in this case properly applied the principle of deference with respect to the FDIC's interpretation of its RIF regulations.

Third, Mr. Chuzi misinterprets FDIC's regulations and commits at least one significant factual error in his analysis. He asserts that he "ha[s] been unable to find any cases interpreting or applying the phrase 'subgroup retention standing.'" Therefore, he declares, "where, as here, the FDIC elects to award vacant positions to employees who have been displaced during a RIF, the vacancies will be awarded to qualified employees according to their retention standing (*i.e.,* tenure seniority) within a tenure subgroup, beginning with tenure subgroup IA." Mr. Chuzi's opinion not only fails to give deference to the FDIC's interpretation of its own regulations, but also ignores the subgroup classifications ranging from the highest, "AD", to the second highest, "A", to the lowest subgroup "B," into which Ms. Smith fell. He also does not consider the definition of "subgroup standing" found in the FDIC's regulations: Subgroup standing means "[t]he employee's relative standing on a retention register based on tenure group and veterans preference subgroup. It does not take into account length of service and performance credit." FDIC Circular 2100.4, § VI. In addition, Mr. Chuzi's opinion does not reflect the FDIC's regulations governing the second round of com-

petition, FDIC Circular 2100.4, § II–8. Under § II–8, "[a] competing employee released from his/her competitive level will be assigned to another competitive level according to bump or retreat rights, as applicable." An employee "will bump into a position held by another employee in a lower tenure group, or in a lower veteran subgroup within the same tenure group ...," but "[a]n employee cannot displace another employee in the same tenure group and subgroup by bumping."

■ As we read the record and the regulations, the FDIC correctly concluded that Ms. Smith could not bump into another position. Indeed, as Judge Iscoe observed, during one of the DRR's training sessions on the RIF process, Ms. Smith made a note indicating that bumping probably was not an option for her. We also believe that on this record the FDIC correctly declared that Ms. Smith could not "retreat into a position held by another employee with a lower retention standing in the same tenure group and subgroup." She could not retreat, as the FDIC found because: "In order to retreat, the position must be the same as, or essentially identical to, a position previously held by the released employee in the Federal service on a permanent basis." FDIC Circular 2100.4, § II–8. In this case, there is convincing evidence, submitted by S & S, that the specialized positions for which selectees were retained are not the same or essentially identical to Ms. Smith's former position at DRR. In addition, nothing in this record convinces us that we should refrain from giving deference to FDIC's interpretation of its RIF regulations.[4] Although Ms. Smith suggests that deference

4. We note also that in opining that Ms. Smith should have been selected for retention rather than Selectees "C" and "E," Mr. Chuzi erroneously stated twice that Ms. Smith's service computation date ("SCD") (which determines

tenure) was June 14, 1964; her SCD actually was much later, June 14, 1976. He also ignored the fact that, in contrast to Ms. Smith, both Selectee "C" and "E" had prior supervisory experience.

should not be given to Ms. Mergen's interpretation of the regulations because as an employee of the FDIC, she is "an interested party," she cannot properly rely either on "the prospect of challenging [Ms. Mergen's] credibility," nor on an insinuation that Ms. Mergen was "lying" or that the "stated reasons [for the DRR's RIF] actions are phony," to preclude summary judgment.[5] *Bradshaw, supra,* 43 A.3d at 323 (internal quotation marks and citations omitted). Consequently, we cannot agree with Ms. Smith that a conflict in the opinions of her expert and that of FDIC "necessitated resolution by a jury."

In short, we discern no genuine issue of fact regarding the underlying case pertaining to the FDIC's resolution of Ms. Smith's claims alleging improper application of the FDIC's RIF procedures, and/or discrimination on the basis of race, gender, or age. And, in light of the record and our legal analysis of the pretext issue with respect to Ms. Smith's discrimination claim, we are unable to conclude that Ms. Smith submitted sufficient evidence to rebut the DRR's legitimate, non-discriminatory reason for its selections. Hence, Ms. Smith cannot prevail on the third prong of a legal malpractice action—that S & S's

breach of the standard of care owed to her with respect to her legal action against the FDIC—"resulted in, and was the proximate cause of, [her] loss or damages." *Martin, supra,* 6 A.3d at 862 (citation omitted). Simply put, we see no basis for disturbing the trial court's judgment granting summary judgment in favor of S & S.[6]

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

5. Ms. Smith argues that her case should have survived summary judgment because of *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), where the Supreme Court held that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* at 147, 120 S.Ct. 2097. "Thus," the court held, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097. As we have concluded, however, Ms. Smith produced only weak and conclusory evidence that FDIC lied about its reasons for the RIF, and thus summary judgment was appropriate

here even under *Reeves. See id.* at 148–49, 120 S.Ct. 2097 ("Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.").

6. Although we have cautioned "that summary judgment should be sparingly granted in cases involving motive or intent," we are satisfied that in this case summary judgment is appropriate. *Futrell, supra,* 816 A.2d at 802, n. 11 (internal quotation marks and citations omitted).