*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0644

STEVEN W. NICKLIN, APPELLANT,

V.

THE STONESDALE UNIT OWNERS' ASSOCIATION, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2020-CA-002486-B)

(Hon. Robert R. Rigsby, Trial Judge)

(Submitted October 19, 2023                    Decided January 11, 2024)

*Robert C. Gill*, *Matthew J. Antonelli*, and *Zachary L. Jacobs* were on the brief for appellant.

*Anne K. Howard* was on the brief for appellees.

Before MCLEESE and SHANKER, *Associate Judges*, and THOMPSON, *Senior Judge*.

THOMPSON, *Senior Judge*: Plaintiff/appellant Steven Nicklin brought suit against defendants/appellees the Stonesdale Condominium Unit Owners' Association (the "Association"), the Association's Board of Directors, and individual condominium unit owners (collectively, "Stonesdale"), seeking damages and declaratory and injunctive relief for alleged violations of the District of

Columbia Condominium Act (the "Act"),[1] breach of contract, breach of fiduciary duty, and negligence. Mr. Nicklin now appeals from the trial court's entry of summary judgment in favor of defendants/appellees. He contends that the Superior Court erred in granting summary judgment on the grounds that his claims were time-barred by the applicable statutes of limitations and/or the doctrine of laches. He argues more specifically that the Superior Court erred in its legal determination about his claims' accrual dates and that the record does not support a finding of laches as to his request for equitable relief. Stonesdale defends the Superior Court's ruling and also argues, as to some of Mr. Nicklin's claims, that this court can uphold the summary judgment ruling on the alternative ground that Mr. Nicklin rather than the Association is responsible for maintenance and remediation of the items in question. Mr. Nicklin responds that material factual issues exist relating to which party bears responsibility for certain repairs that preclude summary judgment on that alternative basis.

We agree with Mr. Nicklin's time-of-accrual argument as to his claim that the Association breached its contractual and statutory duties, and with his laches argument as to his claim for equitable relief. We further agree with him that there remain material factual disputes, regarding both when the causes of action accrued for Mr. Nicklin's various breach of contract claims and which party is responsible

---

[1] D.C. Code § 42-1901.01 *et seq.*

for remediation of certain of the complained-of problems (and we therefore reject Stonesdale's position that we can affirm the Superior Court's summary judgment ruling on the ground that the Association is not the responsible party).  We do not disturb the Superior Court's dismissal of Mr. Nicklin's tort (breach of fiduciary duty and negligence) claims.[2]  Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## Factual Background and Procedural History

Mr. Nicklin owns and resides in a unit that the parties refer to as the Carriage House, one of fifteen units in the Stonesdale Condominium, which he purchased on May 19, 2015.  The condominium is governed by the Association's Board of Directors and is subject to a Declaration and By-Laws recorded in 1982. The Carriage House is a stand-alone building and is the only unit that is separated from the condominium's main building, where the rest of the units are located.

---

[2] As Stonesdale notes, Mr. Nicklin's opening brief did not address the dismissal of those claims. *See Washington Convention Ctr. Auth. v. Johnson*, 953 A.2d 1064, 1082 (D.C. 2008) ("[A]rguments raised for the first time in a reply brief come too late for appellate consideration . . . .").  And while Mr. Nicklin's reply brief asserts that the Superior Court erred in stating that he had conceded that his tort claims were barred, he appears to be satisfied that the result of his tort claims should be the same as the result of his breach (of contract and statutory duties) claims. *Cf. Asuncion v. Columbia Hosp. for Women*, 514 A.2d 1187, 1191 (D.C. 1986) (recognizing that in some cases "alleged negligence and breach of contract are typically premised on the same duty of care and, as a consequence, should typically lead to the same legal result").

According to the allegations of Mr. Nicklin's second amended complaint, he has experienced several problems with the Carriage House. In various emails to the Association and in correspondence to the Association through its counsel, Mr. Nicklin has complained of and demanded repairs to address various issues. He asserts that the issues, and his claims in this litigation, "can be generally grouped into eight categories: the foundation, sanitary sewer, grading/drainage around the exterior perimeter of the [C]arriage [H]ouse building, scuppers and gutters, stucco/brick mortar, roof of the [C]arriage [H]ouse building, windows, and mold infiltration to Mr. Nicklin's unit." In responses to the letters to counsel, the Association contested Mr. Nicklin's allegations that it had failed to perform adequate maintenance and repairs, and further asserted that it was Mr. Nicklin's duty to repair certain elements, including the Carriage House's windows, doors, and roofs, and to resolve leaks, mold, and structural damage.

Mr. Nicklin commenced this lawsuit on May 12, 2020. After Stonesdale moved to dismiss the original complaint, the Superior Court entered an order on October 2, 2020, dismissing as time-barred Mr. Nicklin's claims related to fraudulent and negligent misrepresentation, but denied the motion as to Mr. Nicklin's other claims pending discovery. Mr. Nicklin filed his Second Amended Complaint on October 27, 2021. On March 3, 2022, Stonesdale filed an Opposed Motion for Summary Judgment, arguing that summary judgment was proper

because Mr. Nicklin knew of each issue "no later than March 10, 2017," and thus his claims were time-barred under the applicable three-year statute of limitations.

On July 24, 2022, the Superior Court denied Mr. Nicklin's motion and granted summary judgment in favor of Stonesdale. The court found that each of Mr. Nicklin's causes of action was subject to the "three-year statute of limitations . . . and/or the doctrine of laches," and essentially agreed with the defendants that Mr. Nicklin's claims were time-barred because "each of the 'problem areas' . . . were [sic], in fact, well known to Plaintiff no later than March 10, 2017" (and thus more than three years before Mr. Nicklin filed suit). The court highlighted the evidence that Mr. Nicklin was aware of the sanitary sewer-line problem since 2015 and experienced its effects in 2016; that Mr. Nicklin was "on notice" of drainage issues in the courtyard when he purchased his property in May 2015 and discussed them with Stonesdale's President in July 2014 and July 2015; that Mr. Nicklin reported the problem with the scuppers and gutters "between January 2016 and March 2017"; that even assuming the Association was responsible for repairing Mr. Nicklin's windows, he had known of the leaking windows since April 2015; that even if the lower roofs (i.e., the Carriage House's balcony roofs) were the responsibility of the Association, Mr. Nicklin knew the roofs needed repair as early as July 2014 and April 2015, as evidenced by emails he sent and documents he received (and that Mr. Nicklin's claim for damages "associated with water

intrusion from the lower roofs accrued when he purchased the property"); and that Mr. Nicklin knew about the mold problems as early as March 2015. Regarding Mr. Nicklin's claims for equitable relief, the court reasoned that "[i]n equitable matters the courts of the District of Columbia will apply the analogous statute of limitations that exists had the claim been brought at law." This appeal followed.

## I.      Standard of Review

"Our review of the trial court's summary judgment decision is *de novo*, and hence, we conduct an independent review of the record, construing it in the light most favorable to the non-moving party." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 437 (D.C. 2013). The moving party has the burden of establishing that no genuine issue of material fact exists; once that initial showing has been made, the burden shifts to the non-moving party to show such an issue exists. *Kalorama Citizens Ass'n v. SunTrust Bank Co.*, 286 A.3d 525, 531 (D.C. 2022) (quoting *Smith v. Swick & Shapiro, P.C.*, 75 A.3d 898, 901 (D.C. 2013)). "A genuine issue of material fact exists if the record contains some significant probative evidence . . . so that a reasonable fact-finder could return a verdict for the non-moving party." *Id.* (internal quotation marks omitted) (quoting *1836 S St. Tenants Ass'n, Inc. v. Estate of Battle*, 965 A.2d 832, 836 (D.C. 2009)).

## II.  Analysis

Mr. Nicklin makes several arguments as to why we should reverse the trial court's determination that the statute of limitations bars his claims.  We agree with his argument as to how the time of accrual of his claims should be determined.  We also conclude that, while the Association indisputably was assigned repair-or-replace responsibility as to some of the problem items, there remain issues of fact regarding the Association's responsibility as to other items.  Upon that conclusion, we decline Stonesdale's invitation to affirm the summary judgment ruling in their favor on the ground that Mr. Nicklin as the unit owner, and not the Association, is responsible for maintenance and remediation of the items in question.

### A.  The Condominium Act and the Stonesdale Condominium Instruments

The District of Columbia Condominium Act (the "Act") provides that:

> Except to the extent otherwise provided by the condominium instruments, all powers and responsibilities with regard to maintenance, repair, renovation, restoration, and replacement of a condominium shall belong to:
>
> (A) The unit owners' association in the case of the common elements; and
>
> (B) The individual unit owner in the case of any unit or any part of a unit.

D.C. Code § 42-1903.07(a)(1).  The term "condominium instruments" refers to "the declaration, bylaws, and plats and plans, recorded pursuant to the provisions of [the Act]," including "[a]ny amendment or certification of any condominium

instrument . . . so long as such amendment or certification was made in accordance with the provisions of this chapter." D.C. Code § 42-1901.02(5).

This court strictly construes and interprets the "clear, simple, and unambiguous" language of condominium instruments, including bylaws, as "a contract that governs the legal rights between the Association and unit owners." *Johnson v. Fairfax Vill. Condo. IV Unit Owners Ass'n*, 548 A.2d 87, 91 (D.C. 1988). With respect to condominium instruments, as with all contracts, we adhere to the objective theory of contracts, "which means that the written language will govern the parties' rights, unless it is not susceptible of clear meaning." *D'Ambrosio v. Colonnade Council of Unit Owners*, 717 A.2d 356, 359 (D.C. 1998) (quoting *Sagalyn v. Found. for Pres. of Historic Georgetown*, 691 A.2d 107, 111 (D.C. 1997)). "[W]hether a contract is ambiguous[] is a legal question, which this court reviews *de novo*." *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006). "[I]f a contract is ambiguous, and the evidence supports more than one reasonable interpretation, the interpretation is a question of fact for the [finder of fact]." *Mamo v. Skvirsky*, 960 A.2d 595, 599 n.5 (D.C. 2008) (first alteration in original) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 966 (D.C. 1984)).

The Stonesdale Condominium By-Laws expressly adopt the definition of "Common Elements" and "Limited Common Elements" as they appear in the Act.

By-Laws Article I.2.[3] Mr. Nicklin argues that his claims all relate to items that are common elements under the Act and the condominium instruments, for whose maintenance and repair the Association is directly responsible.

## B. The Accrual Dates of Mr. Nicklin's Breach Claims

The parties do not dispute the Superior Court's ruling that "[e]ach cause of action in the Amended Complaint is subject to a three-year statute of limitations." The dispute is about when Mr. Nicklin's various claims accrued.

"In general, a 'claim . . . accrues for statute of limitations purposes when injury occurs.'" *Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011) (alteration in original) (quoting *Doe v. Medlantic Health Care Grp., Inc.*, 814 A.2d 939, 945 (D.C. 2003)). As to breach of contract claims, the injury occurs when the plaintiff has actual or constructive notice of the breach. *See Radbod v. Moghim*, 269 A.3d 1035, 1044 (D.C. 2022) (explaining that a breach of contract claim ordinarily accrues "on the date the contract is breached," but that under the so-called discovery rule, "a breach of contract claim does not accrue, and the statute of limitations period does not begin to run, until the plaintiff knows, or in the exercise

---

[3] "'Common elements' shall mean all portions of the condominium other than the units. . . . 'Limited common element' shall mean a portion of the common elements reserved for the exclusive use of those entitled to the use of 1 or more, but less than all, of the units." D.C. Code § 42-1901.02(1), (19).

of reasonable diligence should know, of the injury" (internal quotation marks omitted)).

Here, we conclude that the Superior Court erred in ruling that the accrual date for Mr. Nicklin's breach claims was the date when he first learned of the various problems. It also was error for the court to focus, as it did with respect to some of Mr. Nicklin's claims, on when Mr. Nicklin notified the Association of the various problems or requested that the Association correct the issues.[4] The correct principle was addressed expansively by the Maryland Court of Appeals (now known as the Supreme Court of Maryland) in *Antigua Condominium Ass'n v. Melba Investors Atlantic, Inc.*, 517 A.2d 75 (Md. 1986). Construing a repair clause in the contract of sale for condominium units, the Maryland court explained:

> We do not interpret the Repair Clause as simply a warranty of the condition of a unit or of the common elements as of the time of closing with a Unit Owner. Had [the vendor] simply guaranteed the condition of the property as of the date of closing with a Unit Owner, any breach of that guarantee would necessarily occur at closing and, absent a special statute, the cause of action would accrue for limitations purposes when the breach was discovered. . . . The breach of th[e] covenant to repair does not occur at closing or necessarily when

---

[4] For example, the court emphasized that "the [s]cuppers and [g]utters were a problem area that [p]laintiff himself reported he complained to Stonesdale about between January 2016 and March 2017[,] which would also make them time barred." The court reasoned that Mr. Nicklin's May 12, 2020, claim related to courtyard drainage was time-barred because he requested that the Association correct the issue by March 10, 2017.

notice is given. Conceptually, the ways in which one who has contracted to repair could breach that contract include repudiating the obligation before any notice is given, or, after being on notice of the defect, failing to undertake the repairs within a reasonable time, expressly refusing to repair, or, after undertaking to repair, abandoning the work before completion.

*Id.* at 82-83 (citations omitted).  The Maryland court continued:

Under our interpretation of the Repair Clause, limitations do not begin running at the time a defect is discovered. As a consequence, even though giving notice of a defect presupposes discovery of the defect, it does not follow that limitations cannot begin to run later than the date on which notice of a defect was given. After timely notice [the vendor] was not required to repair instantly. There was a period of time during which [the vendor] could investigate the problem and prepare to perform the actual repair work. That period affects when Plaintiffs should have discovered that [the vendor] breached the Repair Clause.

*Id.* at 83.

Although our court has not addressed the issue in as expansive a way, our opinion in *Baker v. Chrissy Condominium Ass'n*, 251 A.3d 301 (D.C. 2021), embraced essentially the same understanding of the accrual date for a claim of breach of a condominium association's contractual duty of repair.  We noted that "[t]here may well be a reasonable period between the [date when a unit owner informs her condominium association of a problem] and the date when the [a]ssociation would be obliged to commence repairs of the [problem], in order to avoid liability under the Bylaws (or otherwise) for compensable damages

attributable to delay" in making repairs. *Id.* at 309.[5] To avoid summary judgment on his claims for damages from breach of contract, Mr. Nicklin had the burden of pointing to evidence raising an issue of material fact as to whether the Association repudiated its promise to repair (including by unreasonably delaying action) within the three-year limitations period—in other words, evidence raising an issue of fact as to whether Mr. Nicklin first had actual or inquiry notice of the Association's *breach* of its duty to repair within the limitations period. In focusing solely on when Mr. Nicklin was on actual or inquiry notice of the problems themselves, the Superior Court erroneously treated the Association's promise to repair "as simply a

---

[5] *See also Fowler v. A & A Co.*, 262 A.2d 344, 347-48 (D.C. 1970) (holding that where defendant waterproofing contractor "guaranteed [a] dry basement," promising to "maintain dryness" of basement for five years following completion of work; wetness in the plaintiff's basement returned fifteen months after defendant completed its work; defendant repeatedly promised to correct the problem after plaintiff notified it of the problem; plaintiff sent a letter dated June 5, 1963, demanding performance within five days; and it became apparent only after June 10, 1963, that the defendant had totally repudiated its promise, "the statute of limitations began to run against the repudiation . . . on June 10, 1963"); *cf. Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 80 (D.C. 2017) (explaining, in unjust enrichment action, that "[t]here remains the question of what was a 'reasonable amount' of time by which appellant should have regarded the fact that appellees did not pay him for his services to be a rejection of any such claim").

The Superior Court distinguished the instant case from "cases involving repudiation, guarantees or warranty provisions of a contract," but we are not persuaded by the distinction where, as here, the repudiation, guarantee, or warranty involves a promise to repair. As we said in *Fowler*, the guarantee provision in issue there was "clearly a promise to do whatever is necessary, including repair," 262 A.2d at 347, making it indistinguishable in any material way from the promise to maintain and repair or replace involved in this case.

warranty of the condition of a unit or of the common elements as of the time of closing with a Unit Owner." *See Antigua Condo. Ass'n*, 517 A.2d at 82.

We could nevertheless affirm the grant of summary judgment in favor of Stonesdale if the record established as a matter of law that the accrual dates of Mr. Nicklin's claims were outside the three-year period prior to his filing suit—that is, if no reasonable jury could conclude on the factual evidence presented that the date when Mr. Nicklin first had actual or constructive notice of the Association's breach of its promise to repair fell within that three-year period. On the summary judgment record before us, we cannot so conclude. For one thing, the question of whether a delay in undertaking or completing repairs was unreasonable is an intensively factual question that is rarely appropriate for summary disposition. For purposes of whether Mr. Nicklin had constructive notice of the Association's repudiation of its (alleged) responsibilities,

> [w]hat constitutes a reasonably diligent investigation [by the plaintiff] is a "highly factual analysis" that requires consideration of all relevant circumstances, including the defendant's conduct and misrepresentations, the reasonableness of the plaintiff's reliance on the defendant's actions, the "confidence reposed by the plaintiff in the defendant," and the existence of a "confidential or fiducial relationship" between the parties.

*Radbod*, 269 A.3d at 1044-45 (quoting *Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996)). And, as to each of Mr. Nicklin's particular claims, it is not clear

when the Association should be deemed to have repudiated its (alleged) obligations. Regarding the sewer-line back-up issue, Mr. Nicklin recounts that at various points in time, the Association "performed certain superficial repair work," "arranged for contractors to perform some surface cleaning within his unit," and "committed to obtain plans from the District government to resolve the problem, obtain quotes for repairs, and to perform snaking of the sewer lines three times per year." Regarding water pooling in the courtyard, the Association points to evidence that by March 10, 2017, Mr. Nicklin requested the Association to correct the water pooling, but Mr. Nicklin contends that the Association did not explicitly refuse to remedy the drainage and courtyard-slope issues until it did so in a November 18, 2019, letter. As to the scuppers, gutters, and downspouts, while Stonesdale points to the evidence that Mr. Nicklin made reports to the Association from January 2016 through March 2017 complaining of failing scuppers and gutters, Mr. Nicklin highlights the evidence that the Association "submitted tickets" on those problems after Mr. Nicklin reported them in 2018, suggesting that repairs were underway. As to the roof, Mr. Nicklin alleges that the Association was not aware of roof issues until he reported the leaks in August or September 2018, at which point the Association represented that they were obtaining quotes to replace the roof. As to the stucco and the mold, the record does not establish whether and when the Association refused to repair or remediate and when its

delay in repairing or remediating became unreasonable. In sum, we conclude that summary judgment was inappropriate when there are genuine issues of material fact as to when Mr. Nicklin had notice of the Association's repudiation of its (alleged) responsibility to remediate the various items at issue.[6]

## C.  The Association's Responsibility as to Various Complained-of Items

While there is no genuine dispute between the parties that the Association generally has a responsibility to repair and maintain the condominium's common elements "as listed in the Association's governing documents," *see* By-Laws Articles IV.1(c) and VI.5.A, as noted above the Association disclaims repair responsibility as to a number of items. The Association contends that the prior owner's "poor construction of the roof decks" on the Carriage House's lower roofs caused the roof leaks about which Mr. Nicklin complains, possibly implicating D.C. Code § 42-1903.07(a)(2), which states that, "[t]o the extent that damage is inflicted on the common elements . . . , the unit owner causing the same . . . shall be liable for the prompt repair of the damage." The Association further asserts that

---

[6] We discern no need to discuss the so-called "continuing breach" doctrine to which the parties' briefs devote so much attention because Stonesdale appears to be correct that Mr. Nicklin does not challenge the Superior Court's ruling to the extent that it bars any claims for damages that pre-date May 12, 2017 (i.e., three years before Mr. Nicklin filed his lawsuit). Mr. Nicklin's brief asserts that he "is entitled to pursue claims seeking . . . damages arising out of . . . breaches by the Association occurring within the three-year period predating his filing of the Complaint on May 11, 2020."

it "is not responsible for damages such as lower roof leaks and mold that existed at the time of Mr. Nicklin's purchase and were caused by unauthorized alterations to Mr. Nicklin's Unit by the prior owners, or by their misuse and neglect, or by Mr. Nicklin's misuse and neglect since his ownership."[7] The Association emphasizes that Mr. Nicklin purchased his Unit in "as is" condition; that he received a credit from the seller because of the mold; that at the time Mr. Nicklin purchased his Unit, he considered the seller to be liable for the mold; and that, from the outset, Mr. Nicklin was aware that he might have responsibility to cure the lower roof problem associated with the prior owner's construction of roof decks. The Association also contends that it is not responsible for the windows of Mr. Nicklin's Unit, "which the Association's Declaration and By-Laws—as well as precedent established since the founding of the Condominium Association in 1982—show as unit owner's responsibility." *See* By-Laws Article VI.5.B.

With regard to the lower roofs and mold caused by leaks, we conclude that the record is not sufficiently developed for us to uphold summary judgment on the ground that the Association had no repair or remediation responsibility. On the one hand, the record shows that the Association and the prior owner of Mr. Nicklin's unit reached an agreement in 2003 that permitted the prior owner "to

---

[7] For example, the Association has asserted that Mr. Nicklin damaged the Carriage House's downspouts by drilling holes in them.

construct roof decks on the two roofs on his unit" and that made him "responsible for maintenance and replacement of the decks" and "responsible for any additional cost associated with removal and reinstallation of the decks . . . in the event of repair or replacement of the underlying roof." But that provision did not by its terms shift responsibility to the unit owner for repair or replacement of the underlying roofs.[8] Further, an expert retained by Stonesdale observed in his report that the expert would need to conduct further testing to define all the causes and sources of leaks into Mr. Nicklin's unit. For his part, an expert retained by Mr. Nicklin identified various causes for moisture penetration related both to the roof decks and the roof itself, and Mr. Nicklin attributes the leaks and mold to faulty or delayed maintenance by the Association.[9]

Regarding the windows and exterior doors of Mr. Nicklin's unit, we conclude that the condominium instruments conflict in a way that renders them ambiguous, such that which party has responsibility for maintenance of the

---

[8] And while the Association reserved the right in the roof deck agreement "to incorporate the provision of th[e] agreement" in its legal documents, the record does not disclose whether the Association ever recorded the agreement among the Association's condominium instruments, as D.C. Code § 42-1901.02(5) permits, such that any successor to the prior notice would be on notice of and possibly bound by the terms of the agreement.

[9] We note that insofar as Mr. Nicklin alleges damages resulting from mold in his unit "caused by water intrusion from Common Elements," it is relevant that per the By-Laws, the Association is not liable "in the absence of negligence." By-Laws Article VI.10.

windows and doors is a question of fact for the fact-finder. Our case law establishes that "[t]he condominium declaration, bylaws, sales agreements, and the relevant statutes must be construed as a whole." *Johnson*, 548 A.2d at 91. Stonesdale emphasizes that Article VI.5.B of the Condominium By-Laws makes maintenance, repair, and replacement of windows the responsibility of the unit owner "[e]xcept for the portions of his Unit required to be maintained, repaired and replaced by the Association." But Mr. Nicklin emphasizes that Section 6.A.2 of the Stonesdale Declaration defines the Unit's perimetrical boundaries as including the "inside surfaces of all windows, doors, and vents." He has reasoned that because only the *inside* surfaces of windows and doors are considered to be part of a unit, and because common elements are defined as "all portions of the condominium other than the units," D.C. Code § 42-1901.02(1A), windows and exterior doors themselves must be part of the common elements. *See* By-Laws Article XII.2 (specifying that, in the case of conflict between the By-Laws and the other condominium instruments, including the Declaration, the latter control).[10] This interpretation at least arguably is supported by the By-Laws' prohibition on painting or altering the *exterior* of doors and windows without prior written

---

[10] Although assuming *arguendo* that the Association is responsible for replacing the windows, the Superior Court found that "the bylaws *clearly indicate* [emphasis added] that the windows are considered a unit owner's responsibility." We cannot agree.

consent of the Board, a prohibition that suggests that only the interior of doors and windows are within the control of the unit owner. By-Laws Article VI.8; *see also* By-Laws Article VI.5.A.(1) (making the Association responsible for maintenance of the Limited Common Elements "whether located inside or outside of the Units"); Declaration § 7.B (defining the Limited Common Elements to include "any . . . area designed to serve a single Unit, though located outside the boundaries of that Unit").

And, in any event, Mr. Nicklin alleges that a cause of the window leak problem is that the Association's stucco contractor "did not properly seal the new stucco to the window frame after removing the old stucco," implicating the Association's duty to repair. *See* By-Laws Article VI.5.A(3). Mr. Nicklin also attributes leaks to rotten window frames, and we note that the Association's Rule 30(b)(6) witness Thomas Kelly Hamilton acknowledged during his deposition that the Association is responsible for maintenance of the "trim around [windows] on the exterior as a common element." Taken together, all these provisions create ambiguity about whether and the extent to which Mr. Nicklin as a unit owner is responsible to remediate the particular window problems about which he complains. The finder of fact will need to look to, inter alia, factors such as the course of performance between the Association and unit owners (such as the evidence, cited in Mr. Nicklin's Statement of Material Facts That Are Not

Genuinely In Dispute, that the Association has replaced rotted windows and trim at the main condominium building) as an aid to interpreting the meaning of the condominium instruments. *See* Restatement (Second) of Contracts § 203(b) & cmt. a (Am. Law. Inst. 1981).

### D.  Laches and Mr. Nicklin's Claim for Equitable Relief

While the statute of limitations governs claims at law, the doctrine of laches may be a bar to stale equitable claims.[11]  *See generally Naccache v. Taylor*, 72 A.3d 149, 152-57 (D.C. 2013).  The doctrine of laches is an affirmative defense that applies only where the party invoking the doctrine shows "an undue and unexplained delay on the part of one party which works an injustice to the other party." *Amidon v. Amidon*, 280 A.2d 82, 84 (D.C. 1971); *see also Am. Univ. Park Citizens Ass'n v. Burka*, 400 A.2d 737, 740 (D.C. 1979) ("Laches will not provide a valid defense . . . unless two tests are met: the defendant has been prejudiced by delay and that delay was unreasonable.").  Determining what an "unreasonable delay" is varies from case to case, and we are not bound to follow the analogous statute of limitations.  *King v. Kitchen Magic, Inc.*, 391 A.2d 1184, 1187 (D.C.

---

[11] "The determination on applicability of a laches defense is a mixed question of law and fact. . . .  We will review the trial court's factual determinations for clear error, and we will review whether those facts are sufficient to sustain the defense *de novo*."  *Curtis v. Gordon*, 980 A.2d 1238, 1246 (D.C. 2009).

1978); *see also Kosty v. Lewis*, 319 F.2d 744, 750 (D.C. Cir. 1963) ("[E]quity does not necessarily follow the statutory period of limitations.").

In its motion for summary judgment, Stonesdale asserted the laches defense only as to Mr. Nicklin's count for declaratory judgment. But Mr. Nicklin's prayer for equitable relief was not limited to a prayer for declaratory relief confirming that various elements are common elements that the Association is obligated to maintain and repair or replace. He also requested a "mandatory injunction" directing the Association and its Board to perform all necessary remedial actions.[12] *See Baker*, 251 A.3d at 310 (recognizing a unit owner's "right to sue the Association to ensure compliance with its obligations under [condominium] Bylaw[s]").

In any event, Stonesdale's invocation of the laches affirmative defense fails. Even if *arguendo* Stonesdale had sufficiently proven unreasonable delay in Mr. Nicklin's assertion of his claim for equitable relief, it could not establish the requisite prejudice by mere conclusory statements that it was prejudiced by Mr. Nicklin's delay. Upon our review of the summary judgment record, we conclude that Stonesdale has not shown how it was actually prejudiced by any delay. *Cf. Burka*, 400 A.2d at 744 (finding prejudice to the defendant developer, reasoning

---

[12] "[D]eclaratory and injunctive relief are both forms of equitable relief." *Vines v. Mfrs. & Traders Tr. Co.*, 935 A.2d 1078, 1084 (D.C. 2007) (quoting *Crawford v. District of Columbia*, 891 A.2d 216, 219 n.7 (D.C. 2006)).

that "[p]otential opponents [of a development project] should not ordinarily be permitted to . . . wait until a developer has obtained zoning, architectural plans, financing, and/or other costly prerequisites to a building permit and then claim the right, at the last minute, to sue, here three years later"). Accordingly, it was error to dismiss Mr. Nicklin's claims for declaratory and injunctive relief on the ground of laches.

## Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed in part (as to the tort claims) and reversed in part, and the matter is remanded for further proceedings consistent with this opinion. It is

*So ordered*.