**Smart AZIKEN, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 11–CV–1088.**

District of Columbia Court of Appeals.

Argued March 7, 2013.
Decided June 20, 2013.

Gregory L. Lattimer, Washington, DC, for appellant.

Bradley A. Sarnell, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.

Before THOMPSON and McLEESE, Associate Judges, and RUIZ, Senior Judge.

THOMPSON, Associate Judge:

Appellant Smart Aziken brought suit against the District of Columbia (the "District"), seeking damages for the alleged breach of a contract under which a so-called "reimbursable detail" of Metropolitan Police Department ("MPD") officers was assigned to provide police services on Friday and Saturday nights in the area around 9th and U Streets, N.W., where appellant's nightclub establishment was in operation. Appellant contends that the contract was breached when the officers assigned to the detail on January 20, 2007, went to the police station to process an arrest, leaving the assigned area without a police presence. As a result, appellant claims, the officers failed to deter a shooting that occurred at the nightclub and that led to its closure and revocation of its liquor license. The trial court granted summary judgment in favor of the District, concluding that "no reasonable person could have foreseen at the time of the contract formation that if the police were not present, a person would commit a criminal act inside the [nightclub] and that,

at least partially as a result of that shooting, the [nightclub] would lose its liquor license."

Appellant contends that the trial court erred in granting summary judgment. The District defends the trial court's unforeseeability ruling, but it also argues that summary judgment was warranted on the alternative ground that appellant failed to present evidence of a "contract with terms that would be breached by the conduct he alleged." We agree with the District that summary judgment was warranted on that alternative ground. We therefore affirm the order of summary judgment.

## I.

The complaint alleges the following background facts: Appellant did business as Smarta Broadway 1919 Club, located at 1919 9th Street, N.W. In late 2006, appellant and other business owners doing business on 9th Street formed "The 9th Street Business Association" (the "Association"). The Association entered into an agreement with the MPD under which MPD was to provide two uniformed MPD officers in marked police cars to be stationed on 9th Street, near its intersection with U Street, N.W., on Friday and Saturday nights between the hours of 10:00 p.m. and 4:00 a.m., "as a deterrent." "As a member of the [A]ssociation," appellant "contributed to the payment of the fee associated with the retention of the [officers]."

In the early morning hours of January 20, 2007, a young woman was ejected from appellant's club for smoking marijuana. Shortly thereafter, Jamel Mackabee, the young woman's boyfriend, seeking revenge, "entered [appellant's] establishment by brandishing a gun at the entrance," which was "located at or near where the reimbursable detail would have been located had they been on duty." As Mackabee

forced his way into the club, "a ruckus broke out that would have been seen by the members of the reimbursable detail had they been on duty." Mackabee shot at one of the club's security guards but, missing his intended target, fatally shot a 17–year–old named Taleisha Ford.[1] Immediately after the shooting, the Mayor "vowed to shut down [appellant's] establishment[.]" At 5:00 p.m. the same day, the Chief of Police closed down the club and sought the revocation of appellant's liquor license.[2] The sole count of the complaint asserts that "[a]s a result of the defendant[']s breach of contract, [appellant's] establishment has been shuttered and he has suffered actual and foreseeable damages[ ]" of "no less than $5,000,000 for breach of contract and breach of the duty of good[ ]faith and fair dealing."

There is no dispute that, at the time of the shooting and the events leading up to it, the MPD reimbursable-detail officers were away from the 9th and U Streets location because, after arresting an individual just outside appellant's club (on a bench warrant for assault with intent to kill), they had gone to their police station to process the arrest. The complaint asserts that if the officers had remained on patrol in the assigned area, they "would have acted as a deterrent and would have been in a position to intervene as Mr. Mackabee attempted to force his way into" appellant's club.[3]

In a series of motions, the District sought summary judgment on several grounds, including that appellant had "failed to produce the purported contract" and failed to "establish the existence of a valid contract between himself and the District." In opposing summary judgment, appellant pointed to three documents as evidence of the contract. The first document is an unsigned MPD invoice for an "event" identified as the "9th Street Overtime Club" and a location identified as "9th & U ST NW." The invoice shows a "Date Received" of "Dec. 26, 2006" and lists the name of an "Event Organizer Advised of Estimated Cost of Police Services" ("Yeshiemebet Belay") for several dates (December 29 and 30, 2006, and January 5, 6, 12, 13, 19, and 20, 2007). Entries on the same lines as December 29, 2006, and December 30, 2006, show as "Times" the hours "2200–0400." No times are listed for the other dates, but a column labeled "# of Hours" contains the entry "6" for each of the listed dates. The invoice quotes a percentage of "grand total due immediately" and a "remainder balance due after the event."

1. The incident is described in this court's opinions in *Mackabee v. United States*, 29 A.3d 952 (D.C.2011), and *Aziken v. District of Columbia Alcoholic Beverage Control Bd.*, 29 A.3d 965 (D.C.2011).

2. In 2008, the District of Columbia Alcoholic Beverage Control Board (the "ABC Board") revoked the club's liquor license. *See Aziken*, 29 A.3d at 968.

3. In a brief opposing the District's motion for summary judgment, appellant argued that "more importantly, the assailant would have been visible to [the detailed officers] . . . since he was brandishing the weapon outside of the Club." We note in passing that the testimony in Mackabee's criminal trial was to the effect that Mackabee did not brandish his weapon until he was well *inside* the club. *See Mackabee*, 29 A.3d at 955 (reciting that Mackabee entered the club along with the young woman who had been ejected, asked, "[W]here is the guy [the young woman] had the argument with," and then in response to a security guard's statement that he had to be searched, "patted his pocket," "a gesture that [the security guard] understood to mean that [Mackabee] had a weapon"). These facts as recounted in *Mackabee* underscore the trial court's observation in this case that appellant "failed to allege that he will call any witness who will testify that the shooter did, in fact, display a weapon outside the club."

The second document to which appellant pointed as evidence of the contract consists of transcript pages from testimony given by MPD Third District Commander Larry McCoy during the ABC Board proceedings. Commander McCoy agreed that "on the date of [the] shooting two persons from the [MPD] were to be stationed ... in [the] block of 9th Street where [appellant's] club is located," that "[t]here was a detail assigned to 9th Street over time," and that merchants "were charged to have those two police officers in that location." The third document is a copy of a check dated January 5, 2007, drawn by appellant and made payable to the Association. Appellant contends that the check was for his "share of the payment for the reimbursable detail."

The judge originally assigned to the case (the Honorable Robert I. Richter) declined to grant summary judgment in response to the first of the District's motions, finding that a "factual dispute exists regarding whether the ... Association entered into a contract with the MPD, and whether plaintiff was a party to that contract"; that "[t]he fact that plaintiff has not produced the physical contract does not mean that he cannot make a case for breach of contract"; and that "[a] contract may be based upon an oral agreement and circumstantial evidence may be admitted to prove the contract's existence."

The District thereafter sought summary judgment on the ground that appellant could not demonstrate that the District had breached any alleged contract terms because "two [ ] officers did, in fact, work from 10:00 p.m. to 4:00 a.m. on ... January 20, 2007," and because the District "is not answerable *ex contractu* for the criminal acts of third parties." In its August 24, 2011, summary judgment order, the court (the Honorable Craig Iscoe) rejected the first of these grounds, reasoning that there was a "possibility that the parties differed in their understanding of the contract, that is, [appellant] believed the contract obligated MPD to either replace any two officers who were mandated by law to leave, or required that at least one officer remain at all times, and MPD believed that the contract permitted officers to be absent from the detail whenever they needed to make an arrest and conduct the necessary follow up processing." The court concluded that the terms of the contract were "matters to be resolved by the jury[.]" Essentially accepting the District's alternative argument, however, the court granted summary judgment, reasoning that appellant "cannot establish that the MPD's alleged absence caused the shooting" and that even on the assumption that the alleged breach caused the shooting, appellant "cannot establish foreseeability without having the finder of fact engage in speculation and guesswork."

This appeal followed. Appellant contends that the question was not whether the alleged breach caused the shooting but instead whether, because of the claimed breach, the officers failed to deter the shooter and failed to intervene in the events that led up to it. He further argues that the foreseeability of some or all of his claimed damages was a jury question and that summary judgment in favor of the District therefore was improper.[4]

---

4. Appellant also asserts that "there was not a single material undisputed fact that could be properly considered by the trial court," but he does not develop that argument. In addition, he cites the trial court's references to the ABC Board's findings about "multiple violations" beyond "the one criminal incident" that jeopardized the club's liquor license. He argues that such references show that the trial court impermissibly relied on inadmissible hearsay in reaching its determination that his damages were not foreseeable. In light of our

## II.

"We review a grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party." *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C.2013). If the party opposing summary judgment has no proof to support his claims, summary judgment in favor of the defendant is proper. *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C.2012). "A plaintiff cannot 'stave off the entry of summary judgment' through '[m]ere conclusory allegations.'" *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1063 (D.C.2008) (internal quotation marks omitted); *see also Graff v. Malawer*, 592 A.2d 1038, 1041 (D.C.1991) ("'[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient'" to defeat a motion for summary judgment.).

## III.

Viewing the evidence in the summary-judgment record in the light most favorable to appellant, we assume that it sufficed to establish that there was a contract between MPD and the Association for six hours of reimbursable-detail services by two officers on January 20, 2007.[5] We agree with the District, however, that there was no evidence from which a jury could have found without speculation that the contract required that an officer or officers be in the vicinity of the 9th & U Streets location at all times during the six-hour contract period even if the assigned officers made an arrest during that time.[6] There likewise was no evidence that would have permitted the court to imply such a term. As we explain below, summary judgment for the District was warranted whether we view the contract as ambiguous regarding what should occur if an arrest was made or, instead, we regard the contract as having simply failed to deal with that contingency.

### A. Applicable Legal Principles

▆▆ Our jurisdiction "adhere[s] to an objective law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the

---

disposition of the case, we need not reach these issues.

5. At oral argument, the court inquired about the basis for appellant's standing to bring this action under the contract entered into by the Association. Although appellant's response was not comprehensive, and although the court may notice a jurisdictional defect at any time, on the record before us, we do not think we need be concerned that appellant lacks standing to sue on the contract. Appellant has alleged, without contradiction, that he is a member of the Association, and he has presented documentary evidence, in the form of a check to the Association, from which it can be inferred that he financially supported the contract. It is also uncontradicted that appellant's nightclub was located close to (if not at) the intersection where the officers were to have been posted so that, it also can be inferred, appellant's business would have directly benefitted from the officers' presence at that intersection pursuant to the contract. *Cf. Fort Lincoln Civic Ass'n*, 944 A.2d at 1064 ("'In order to sue for damages on a contract claim, a plaintiff must have either direct privity or third party beneficiary status.'"); *District of Columbia v. Campbell*, 580 A.2d 1295, 1302 (D.C.1990) ("A third party may sue on a contract if the contracting parties intended the third party to benefit."). Moreover, appellee, the District, has not challenged appellant's standing.

6. Specifically, the District argues that appellant "has not produced evidence sufficient to meet his burden of proof that the contract . . . prohibited detail officers from leaving the detail area for police business, or would have required the Department either to replace detail officers who had to leave the detail area to process an arrest or to have one detail officer remain at the detail while the other processed the arrest."

intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite meaning." *Hartford Fin. Servs. Group v. Hand,* 30 A.3d 180, 187 n. 12 (D.C.2011) (internal quotation marks omitted); *see also Beck v. Cont'l Cas. Co.,* 936 A.2d 747, 751 (D.C.2007) ("[A] written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." (internal quotation marks omitted)). Where the contract language is not susceptible of a clear and definite meaning—i.e., where the contract "is determined by the court to be ambiguous"—"external evidence may be admitted to explain the surrounding circumstances and the positions and actions of the parties at the time of contracting." *Rivers & Bryan, Inc. v. HBE Corp.,* 628 A.2d 631, 635 (D.C.1993); *see also Howard Univ. v. Best,* 484 A.2d 958, 967 (D.C.1984) (" '[W]here there is some lack of clarity in the terms of the contract, ... testimony regarding the intent of the parties and the meaning of the terms in the context may be required, and will properly be admitted in order to reach an objective interpretation.' "); *id.* at 967 n. 2 (explaining that the "first step ... is determining what a reasonable person in the position of the parties would have thought the disputed language meant"); *id.* at 967 ("[T]he presumption is that the reasonable person knows all the circumstances before and contemporaneous with the making of the [integrated contract and ] ... is also bound by all usages—habitual and customary practices—which either party knows or has reason to know. The [reasonable person] standard is applied to the circumstances surrounding the transaction and to the course of conduct of the parties under the contract, both of which are properly considered when ambiguous terms are present." (quoting *1901 Wyoming Avenue Cooperative Ass'n v. Lee,* 345 A.2d 456, 461–62 (D.C.1975))).

Whether a contract is ambiguous is a legal question, which this court decides *de novo. Tillery v. D.C. Contract Appeals Bd.,* 912 A.2d 1169, 1176 (D.C.2006). " '[C]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction.' " *Dodek v. CF 16 Corp.,* 537 A.2d 1086, 1093 (D.C.1988). " 'An ambiguity exists when, to a reasonably prudent person, the language used in the contract is susceptible of more than one meaning[,]' " *Nat'l Hous. P'ship v. Mun. Capital Appreciation Partners. I, L.P.,* 935 A.2d 300, 310 (D.C.2007), and "the court determines that proper interpretation of the contract depends upon evidence outside the contract itself," *Dodek,* 537 A.2d at 1093, i.e., "where its interpretation depends upon the credibility of extrinsic evidence or upon a choice of reasonable inferences from such evidence." *Id.* at 1092.

"Because consideration of such extrinsic evidence is for the fact finder," once a contract is determined to be ambiguous, summary judgment generally is improper. *District of Columbia v. D.C. PSC,* 963 A.2d 1144, 1156 (D.C.2009). Nevertheless, "where language in a contract is ambiguous, summary judgment can be granted if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Fed. Ins. Co. v. Am. Home Assurance Co.,* 639 F.3d 557, 567 (2d Cir. 2011) (internal quotation marks omitted); *see also Mellon Bank, N.A. v. United Bank Corp.,* 31 F.3d 113, 116 (2d Cir.1994) ("[I]in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent.").

■ In some contract-dispute cases, the problem is not that the language of the contract is ambiguous, but instead that the parties never contemplated a particular contingency and therefore included nothing in the contract that addresses it. In such cases, courts sometimes are able to "fill in the gap"—i.e., to supply the missing term—by looking to what term is usual and customary in the industry, to what is reasonable in the circumstances, or to what is consistent with fairness and justice.[7] "Some authorities say that reasonably implied contractual terms are those that the parties would have agreed to if they had adverted to the matters in question." *Barnes*, 536 U.S. at 188, 122 S.Ct. 2097; *see also Rhode Island Charities Trust v. Engelhard Corp.*, 267 F.3d 3, 7 (1st Cir.2001) ("Even where courts are sure that the parties never thought about an issue, small wrinkles may be ironed out by interpretation where it is clear how the parties would have handled them." (citing Farnsworth, Contracts § 7.16, at 545 (2d ed. 1990))). However, this approach may be "misguided" where "there is reason to believe that the parties might not have easily reached accord on the critical point." *Schortmann v. United States*, 92 Fed.Cl. 154, 164 (Fed.Cl.2010). In this jurisdiction, the rule is that the trial court is "not obliged to let the jury speculate about [what the] parties would have agreed upon had they thought about it." *Nat'l Sav. & Trust*, 300 F.2d at 913. And, even though "the question of whether to imply a promise from given language and background [is] one for the judge," not the jury, the court, too, may decline to "include a provision in the [a]greement that is plainly not there." *Bragdon v. Twenty–Five Twelve Assocs. L.P.*, 856 A.2d 1165, 1170 (D.C. 2004) (cautioning against the "unwarranted extension of the occasional practice of supplying 'omitted clauses' forced upon courts by unexpected circumstances").[8]

■ For a contract to be enforceable, its terms "must be clear enough for the court to determine whether a breach has occurred." *EastBanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1002 (D.C.2008) (alterations and internal quota-

7. *See, e.g., Nat'l Sav. & Trust Co. v. Kahn*, 300 F.2d 910, 913 (D.C.Cir.1962) (stating that where "the parties to a contract neglect to fix the price to ... be paid for personal services, courts usually imply an intent to contract for the value of the performance rendered[,]" the measure of which is the "market value of ... performance" and the best evidence of which is "the usual and customary commission which is paid for such services," and holding that the trial court was free to imply the missing term of a real estate brokerage contract from "the usual practice of brokers and customers in the District of Columbia"); *Independence Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 869 (D.C.2005) ("Generally, 'where no time is specified for the performance of an act, the law implies that it must be done within a reasonable time.' "); Restatement (Second) of Contracts § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essen-tial to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *Barnes v. Gorman*, 536 U.S. 181, 188, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) ("[R]ecent commentary suggests that reasonably implied contractual terms are simply those that 'comport with community standards of fairness[.]' "); *Cooke v. Lynn Sand & Stone Co.*, 70 F.3d 201, 205 (1st Cir.1995) (referring to " 'basic principles of justice that guide a court in extrapolating from the situations for which the parties provided to the one for which they did not' " (quoting E. Allan Farnsworth, Contracts § 7.16, at 547–48 (2d ed. 1990))).

8. *See also PurCo Fleet Servs. v. Koenig*, 240 P.3d 435, 446 (Colo.App.2010) ("[I]t is improper for a court to imply a contract term that amounts to engrafting upon the agreement a provision not agreed to by the parties[.]" (alterations and internal quotation marks omitted)).

tion marks omitted). "[T]he burden of establishing the terms of a contract rests upon the party suing thereon." *Nat'l Rifle Ass'n v. Ailes*, 428 A.2d 816, 821 (D.C. 1981) (internal quotation marks omitted).

With the foregoing principles in mind, we turn back to the record in this case.

*B. Analysis*

1. *The documents on which appellant relies as evidencing the terms of the contract do not establish that, after the detail officers made an arrest, officers were required to be at the assigned location at the time of the shooting.*

▮ The invoice evidencing the contract in dispute here provides for "police services" to be rendered at the "9th & U Street" location. We think its language is, at best, ambiguous as to whether one or both detail officers (or replacements) were required to remain at the assigned location in the event an arrest was made and had to be processed.[9] The "location" term of the invoice specifies clearly enough a base

of operations, but the invoice's reference to the estimated cost of "police services" may reasonably be thought to denote an array of tasks that police officers perform (e.g., making arrests, transporting suspects, and processing arrests), some of which require officers to leave an arrest site and go to their police station. For that reason, we conclude, the requirement to "provide police services at 9th & U Streets" is " 'not susceptible of a clear and definite' meaning." *Hartford*, 30 A.3d at 187 n. 12.[10]

▮ Further, we reject appellant's argument that "the issue of whether a breach of contract occurred is not truly an issue" and that Commander McCoy's testimony "clearly and unequivocally substantiates the breach of contract." Appellant points specifically to Commander McCoy's agreement that "when those two officers made an arrest, [the 9th Street merchants] were left without what they paid for[.]" The problem for appellant is that the record provides no basis for regarding Commander McCoy's testimony as an authori-

---

9. Alternatively, as we discuss below, arrests were a contingency for which the contract did not expressly provide.

10. Appellant suggests that what *is* clear and definite is that the "specific language of the contract [i.e., the invoice] ... discusses the fact that two officers w[ould] be provided for six [] hours, between 2200 and 0400 (10:00 p.m.–4:00 a.m.)[.]" As described above, however, while the invoice specifies the hours (2200–0400) of the reimbursable detail for December 29 and 30, 2006, no hours are specified for January 20, 2007; as to January 20, the invoice specifies only "6" hours of reimbursable detail services. Thus, even leaving aside for a moment the ambiguity created by the invoice's reference to the reimbursable detail providing "police services" at the "9th & U St NW" location, the express language of the invoice does not state that officers were required to be in the vicinity of appellant's club at the time of the shooting.

We also note that while the summary-judgment record contains a copy of appellant's

January 5, 2007, check to the Association for an amount he contends was his share of the cost of the reimbursable detail, the record contains nothing—no testimony by any individual responsible for paying the Association's bills, no Association canceled check drawn to the MPD or the District, and no other evidence—that would have allowed a fact-finder to conclude without speculation that the Association paid the full amount shown on the invoice as the cost of two officers for six hours on January 20, 2007. The trial court's summary judgment ruling refers to "the fact that the District billed the ... [A]ssociation for the full duration of the detail, even though officers were not present the entire time," but the basis for that reference is unclear. The District emphasizes in its brief that the invoice, which was for services to be rendered, "does *not* show that the [MPD] charged the Association the full amount" or for the "remainder balance due after the event."

tative interpretation of, or as an admission by the District about, what the contract required. Nothing in the record indicates that Third District Commander McCoy arranged, or negotiated, or was otherwise responsible for the reimbursable-detail contract or had personal knowledge about the circumstances surrounding the contract (or about the status of payment). *Cf. Wallace v. Eckert, Seamans, Cherin, & Mellott, LLC,* 57 A.3d 943, 950–51 (D.C. 2012) ("[A] party opposing summary judgment must set forth by affidavit or in similar sworn fashion specific facts ... [that] must be made on personal knowledge and ... that show that the affiant is competent to testify about the matters stated in it." (citations and internal quotation marks omitted)). The invoice lists "Lt. Manlapaz" as the individual who coordinated the reimbursable detail, and (although it is unsigned) it contains signature lines for the "Commander, SOD" (i.e., the Commander of the Special Operations Division) and other individuals, but not for the Third District Commander. Also, as already described, Commander McCoy's testimony was given before the ABC Board; his testimony is not in the record as the deposition testimony of the District's Super. Ct. Civ. R. 30(b)(6) witness with respect to the reimbursable-detail contract, and nothing in the record suggests that he spoke on behalf of MPD as to what the contract required.

2. *In light of the ambiguity about what should occur in the event of an arrest and the absence of extrinsic evidence about the parties' negotiations, summary judgment was warranted.*

Appellant urges that it was "for a jury to determine if the police are excused from a contractual obligation if they do not replace two officers who have to process an arrest with two other officers ..., or if it was necessary to take both officers off the detail as opposed to just one." The trial court similarly concluded that since the parties had different understandings of what the contract required, resolution of what it required would have been a jury question (if summary judgment not been granted on another ground). On the record in this case, we disagree.

As the foregoing summary of applicable law indicates, the ambiguity in the contract language and the parties' dispute about what it meant raised a question for the jury only if there was extrinsic evidence for a jury to weigh, from which the jury could draw inferences in deciding what the contract should be construed to mean. *See International Bhd. of Painters & Allied Trades v. Hartford Accident & Indem. Co.,* 388 A.2d 36, 43 (D.C.1978) (explaining that in interpreting ambiguous contract provisions, "[p]articularly significant is extrinsic evidence concerning the parties' negotiations prior to and contemporaneous with the formation of the agreement, as well as their course of conduct under the contract[ ]"). But appellant came forward with no such evidence that a jury could be asked to consider. The record bears out the trial court's observation that appellant "cite[d] to no evidence in the record upon which a jury could make [a] determination" regarding whether the MPD was required to replace the officers or to take just one officer off the street. As the trial court reasoned, appellant might "have provided the [c]ourt with testimony from the parties who reached the agreement to the effect that it was the understanding between the parties that the officers would either not be allowed to leave to process arrests, or that MPD was responsible for replacing officers who were faced with performing their legal duties attendant to ar-

rest."[11] Appellant did not do so (and he was not entitled "to wait until trial to develop claims ... relevant to the summary judgment motion"[12]). The record contains no testimony from Lt. Manlapaz (who, according to the invoice, coordinated the reimbursable detail), no testimony from Yeshiemebet Belay (the "event organizer" who was "advised of the estimated cost of police services"), no testimony from anyone holding himself or herself out as an Association representative, no testimony from the Commander of the Special Operations Division or others who were to approve the invoice, no testimony from the individual ("M. Thompson") identified on the invoice as the person who prepared it, and no testimony from anyone else shown to have been responsible for arranging for reimbursable-detail services.

In short, because appellant failed to come forward with any extrinsic evidence supporting his interpretation of what the contract required, he failed to meet his burden, and the trial court did not err in granting summary judgment. *See White v. White Rose Food,* 237 F.3d 174, 180 (2d Cir.2001) ("'A court may ... grant summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.'").[13]

*3. There is no basis for implying the terms appellant contends were breached, which is another reason supporting summary judgment.*

▉ Another way of looking at the contract documents in this case is not to regard the invoice language as ambiguous, but instead to acknowledge that the parties simply failed to address the contingency that came to pass—i.e., failed to provide for what should happen if the officers made an arrest in the course of providing reimbursable-detail services. Recognizing that there is such a gap, this court could, consistent with the legal principles summarized above, fill in the gap by implying a term or terms that are consistent with relevant custom and practice, or that are reasonable under the circumstances, or that comport with community standards of fairness. However, on the sparse summary-judgment record, that approach is no more availing than would be an effort to resolve the ambiguity in the invoice language without extrinsic evidence about the

11. The trial court observed that as appellant "has failed to provide such evidence, the Court could find that there are no material facts in dispute with regard to this implied term of the contract and that the District is entitled to judgment as a matter of law." We agree that this would have been a sound basis for granting summary judgment.

12. *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir.1995) (internal quotation marks omitted).

13. We note that as a last resort in contract interpretation, this court sometimes applies the secondary rule of construction that "any ambiguity as to the contract's meaning will be construed strongly against the drafter." *Dyer v. Bilaal,* 983 A.2d 349, 355 (D.C.2009); *see also District of Columbia v. C.J. Langenfelder & Son, Inc.,* 558 A.2d 1155, 1164 (D.C.

1989) ("[I]f [the parties'] intention cannot be conclusively determined without resort to secondary rules of construction, then 'the ambiguities remaining in the contract will be construed strongly against the drafter.'"). We think the rule is not apropos in this case where, as the trial court observed, there apparently was no written contract; the invoice is an unsigned, fill-in-the-blank form; there is no evidence about who filled in the various items on the invoice; and, throughout the litigation, appellant has relied on Commander McCoy's testimony (rather than written language) as proof of a contractual relationship (stating, at one point, that the invoice is "beside the point given that Commander McCoy has unequivocally confirmed the existence of the contractual relationship").

parties' negotiations and the circumstances of contracting. We are aware of no custom or practice with respect to reimbursable-detail contracts, and the record contains no expert testimony about accepted standards for providing reimbursable-detail services.[14] We are unable to conclude that "to read the contract sensibly one must imply a promise"[15] by MPD to replace the arresting officers or to have only one officer leave the reimbursable-detail location to process an arrest. Similarly, we are unable to say that any of the terms appellant would have us imply is "an obvious requirement of justice and fair dealing."[16]

We might easily surmise that the Association's preferred term would be among the ones appellant suggests: that the MPD must supply replacement officers if the originally assigned officers needed to leave to process an arrest, or that only one officer would be permitted to leave the assigned area to process an arrest, or that the detail officers must summon other police officers to take custody of the arrestee, or must detain the arrestee on site until the contract period is over. However, it is equally easy to surmise that, for budgetary or policy or other reasons, MPD's preferred term would have been that the assigned officers were permitted to leave the scene to process an arrest, and that MPD would have resisted a contract term that would have required it to assign replacement officers, to permit only one officer to leave to process the arrest, to delay the processing of an arrest, or to require other officers to take custody of the arrestee until the assigned officers could attend to arrest-processing. For that reason, we decline to imply any such terms.

## IV.

To summarize, the documents evidencing the contract do not establish that the contract was breached when the officers assigned to the reimbursable detail left the assigned location to process an arrest, and appellant, who bore the burden of proof, produced no extrinsic evidence that sheds light on what the parties should reasonably have understood would be required if the officers made an arrest during the assignment. Appellant also has identified no persuasive reason why this court should supply a contract term that is required to support his claim of breach. Accordingly, the grant of summary judgment to the District on appellant's breach of contract claim is

*Affirmed.*

---

14. Appellant highlights Commander McCoy's thought that "it'd have been better for one officer to stay out on the street," but Commander McCoy also testified that there "is no clear[-]cut rule to say that one [officer] wo[u]ld go in [to the police station to process the arrest] and one would s[t]ay" at the assigned reimbursable-detail location, that "once an officer [on a reimbursable detail] makes an arrest, they have to leave the area to go into the station and process it, and that's what they did," and that police teams "handle the paperwork together so they can get [back] out [on the street] more quickly."

15. *Allied Commc'ns Corp. v. Cont'l Cellular Corp.*, 821 F.2d 69, 70 (1st Cir.1987) (declining to imply a promise by Continental to remain in business).

16. *Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 47–48 (2d Cir.1988) (declining to imply a promise by Otis to remain in business in Yonkers for a reasonable time, because "[n]o rational trier of fact could conclude [either] that this was the intention of the parties, which they inadvertently failed to express[,] or that the parties ... would have agreed upon the promise for which Yonkers contends had they done so[ ]" had they considered the duration of Otis's commitment to Yonkers).