*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## 19-CV-830

JACOBSON HOLMAN, PLLC, APPELLANT

V.

MARSHA GENTNER, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-1834-15)

(Hon. Brian F. Holeman, Trial Judge)

(Argued December 8, 2020                    Decided February 4, 2021)

*John J. Brennan III* for appellant.

*Philip J. Harvey* for appellee.

Before EASTERLY and MCLEESE, *Associate Judges*, and WASHINGTON, *Senior Judge*.

EASTERLY, *Associate Judge*: This appeal arises out of a dispute over contractual terms in a law firm's operating agreement governing the payout to an equity partner leaving the firm. Marsha Gentner sued Jacobson Holman, PLLC ("the firm"), for breach of contract because it refused to pay the equity interest she

believed was due to her under the firm's operating agreement (actually a collection of agreements). Specifically, she claimed that the firm, where she had worked for three decades, had improperly calculated her equity share by failing to rely on the last annual financial statement issued prior to her notice of withdrawal as required by the operating agreement. She also asserted that a provision in the operating agreement which forced her to forfeit half of her equity interest if she took any clients from the firm violated D.C. Rule of Professional Conduct 5.6(a) and was thus unenforceable. The Superior Court concluded that Ms. Gentner was entitled to judgment as a matter of law, both as to the payout of her equity share under the operating agreement and as to the enforceability of the forfeiture provision. The firm appealed both components of the trial court's ruling. We affirm and publish this opinion to ensure that the members of the District of Columbia Bar understand the strictures of Rule 5.6(a).

## I.     Facts and Procedural History[1]

### A. Ms. Gentner's Tenure at the Firm and the Firm's Operating Agreement as amended.

Ms. Gentner joined a predecessor entity to the firm as an associate in 1983, later becoming an equity partner.  In 1989, the firm's equity partners signed a new Partnership Agreement.  Paragraph 24A of the 1989 agreement addressed "Payment Upon Withdrawal of a Partner."  It provided that payment would be based on a partner's "adjusted Accrual Basis Account," which would "be equal to the Accrual Basis Account of such Partner as of the end of the fiscal year immediately preceding the effective date of withdrawal," and then "adjusted for Net Profits (and Losses) and Accrual Basis Profits (or Losses) allocable to such Partner up to [the] date of withdrawal."  Paragraph 24A identified two methods for calculating "[s]uch adjustment":  the withdrawing partner and the remaining partners would agree on the adjustment, or it would be calculated "by applying the allocation percentage for

---

[1]  The trial court did not issue a written summary judgment ruling and did not clearly identify a set of undisputed facts when it ruled orally.  Further, the parties have not submitted to this court the statements of facts, undisputed or disputed, that they were required to file with the trial court under Super. Ct. Civ. R. 56(b)(2) along with their respective summary judgment motions and oppositions.  Nevertheless, relying on the parties' briefs as well as the exhibits to the parties' summary judgment filings that were included in the joint appendix submitted to this court, we understand the facts set forth below to be undisputed.

the withdrawing Partner of Net Profits determined based on the average allocation percentage to such Partner of Net Profits for the last two fiscal year-ends immediately preceding such withdrawal." Lastly, Paragraph 24A provided that "[t]he adjusted Accrual Basis Account of a Partner at [the] date of withdrawal [would] be established by the accountants regularly employed by the Partnership as soon as practicable after the effective date of such withdrawal[,] . . . [would] be conclusive and binding upon all Partners hereto," and would "include a reduction for doubtful accounts, based upon prior experience of the Partnership."

The firm converted to a professional limited liability company in 1996. The Operating Agreement effecting this conversion expressly incorporated provisions of the 1989 Partnership Agreement that addressed "the withdrawal or retirement of Equity Members, except to the extent that any such provision of the Partnership Agreement [was] inconsistent with the [District of Columbia Limited Liability Act of 1994], the Articles [of Organization] or this Agreement."

The following year, the firm amended the 1996 Operating Agreement. The 1997 Amendment to the 1996 agreement included three new provisions addressing the payout to an equity member when they left the firm. Paragraph 1 contained a forfeiture provision:

In the event an Equity Member withdraws from the Company at any time after the date of this Amendment and takes client(s) of the Company, and the Company does not dissolve within three months of the Equity Member withdrawal date, then the withdrawing Equity Member will forfeit and give up to the Company fifty percent (50%) of his/her Accrual Basis Account . . . .

Paragraph 3 more precisely detailed a two-step process for calculating a departing member's adjusted Accrual Basis Account:

[T]he adjusted Accrual Basis Account (including the respective amounts attributed to accrual capital and cash capital) of an Equity Member who shall have withdrawn from the Company *shall be that amount set forth in the last annual financial statement for the Company prepared by the Company's accountant,* or the last monthly financial statement for the Company prepared by the Company's regularly employed bookkeeper, whichever is later, *prior to the date of the withdrawing Equity Member's notice of withdrawal*, *with adjustments to the withdrawal date*[2] *solely for events occurring in the period between the closing date of such last financial statement and the withdrawal date* . . . .

(emphasis added). No guidance was provided as to what constitutes a qualifying "event."

---

[2] Both parties appear to agree that "adjustments to the withdrawal date" should be understood to mean "adjustments to the Accrual Basis Account *up to* the withdrawal date."

**B. Ms. Gentner's departure and the firm's financial statements.**

In March 2013, Ms. Gentner and the other equity members of the firm received a memo from the two named members, Harvey Jacobson and John C. Holman, announcing their intent to dissolve the firm as it was currently comprised and create a new entity. The equity members were given a choice to leave the firm or join the new entity under new terms that Ms. Gentner deemed unfavorable to her.

By letter dated June 17, 2013, Ms. Gentner announced her decision to leave the firm and requested an accelerated withdrawal date of June 30, 2013. In her letter, Ms. Gentner informed the firm that "in accordance with [their] partnership Agreement, as amended, [she] expect[ed] to be paid the total amount of the accrual capital and cash capital as 'set forth in the last annual financial statement for [Jacobson Holman] prepared by [Jacobson Holman's] accountant'" for 2012, which the firm's accountants had issued on April 30, 2013. That financial statement calculated her Accrual Basis Account as $141,569. Ms. Gentner also noted that "[a]lthough [their] Agreement provide[d] for adjustments 'solely for events occurring in the period between the closing date of such last financial statement and the withdrawal date,'" she was "not aware of any such events which ha[d] occurred

on or after January 1, 2013." Based on these premises, Ms. Gentner requested a payout of $141,569.

The firm acknowledged receipt of Ms. Gentner's resignation letter and agreed to her June 30, 2013, withdrawal date. Shortly before her departure, on June 28 and June 29, two other equity members notified the firm that they would be withdrawing the following month, effective July 31, 2013. The remaining members, at least for the time period leading up to June 30, 2013, stated their intent to remain and transition to "of counsel" positions.

In September 2013, three months after Ms. Gentner left the firm, the firm's accountants, at Mr. Holman and Mr. Jacobson's request, issued a revised annual financial statement for 2012. The revised statement included two liabilities that had not appeared in the original statement—member bonuses and allowances—which reduced Ms. Gentner's Accrual Basis Account by approximately 55%, from $141,569 to $63,938. The parties agree that these liabilities were known to the firm at the time that the original financial statement for 2012 was prepared.

Subsequently, in March 2014, nine months after Ms. Gentner's departure, the firm issued a financial statement ostensibly reporting the firm's finances from

January to July 2013.  This third statement included a significant restatement of the firm's Accounts Receivable.  The initial financial statement for 2012 had included in its statement of Accounts Receivable a line item for "[a]llowance for doubtful accounts" in the amount of $459,716.  The new financial statement for the first half of 2013 acknowledged that figure as a "Beginning balance," then added in a line item for "Bad debt expense" and wrote off $550,514, thereby reducing the firm's doubtful accounts going forward by more than half ($207,098).  It is undisputed that the doubtful accounts reflected in the "Beginning balance" were known to the firm in 2012.  With these new calculations, Ms. Gentner's Accrual Basis Account fell to a negative value of $21,762.

Upon learning that the firm not only refused to pay her any amount of her equity interest, but also alleged she owed the firm money, Ms. Gentner sued for breach of contract in Superior Court.[3]  The firm filed an answer in which it asserted it was permitted under its operating agreement, as amended, to adjust Ms. Gentner's Accrual Basis Account, and acknowledged it had relied upon the revised annual financial statement for 2012 and the financial statement for the first half of 2013 to

---

[3] Contemporaneously, a different equity member of the firm, Simor Moskowitz, sued the firm in federal court, in the Eastern District of Virginia. See *infra* note 10.

calculate Ms. Gentner's equity interest.[4] The firm also counterclaimed and sought a declaratory judgment that Ms. Gentner had a negative Accrual Basis Account which could be treated as an account receivable by the firm and be subject to collection. The firm further alleged that twenty of the firm's clients had followed Ms. Gentner to her new firm, and on that basis asserted that, if the court determined Ms. Gentner's equity interest was a positive value, then her Accrual Basis Account should be cut in half under the forfeiture provision in Paragraph 1 of the 1997 Amendment to the 1996 Operating Agreement.

Both parties moved for summary judgment. At a hearing in July 2017, the trial court made an oral ruling in which it determined that: (1) Paragraph 3 of the 1997 Amendment controlled how Ms. Gentner's Accrual Basis Account should be calculated, and required that only the firm's original financial statement for 2012 be considered for that calculation; (2) there remained a triable issue of fact regarding whether there was a qualifying "event" permitting adjustment of Ms. Gentner's Accrual Basis Account; and (3) the forfeiture provision of Paragraph 1 of the 1997 Amendment violated D.C. Rule of Professional Conduct 5.6(a) and was

---

[4] As the justification for the downward adjustment of Ms. Gentner's Accrual Basis Account, the firm specifically asserted that it needed to account for the departure of six equity members from the firm and uncollected fees from clients.

unenforceable as a matter of law. At a hearing in August 2018, however, the court clarified that it read Paragraph 3 of the 1997 Amendment to plainly allow adjustments only for events occurring *prior* to Ms. Gentner's June 30, 2013, withdrawal date, and thus a fact-finder could not consider the equity members' July 2013 departures to be a qualifying event. The parties subsequently filed a joint motion for entry of judgment in Ms. Gentner's favor, which the trial court[5] granted. This timely appeal followed.

## II. Standard of Review

We review de novo a trial court's order granting summary judgment. *Aziken v. District of Columbia*, 70 A.3d 213, 218 (D.C. 2013). "Summary judgment is appropriate only when there are no material facts in issue and when it is clear that the moving party is entitled to judgment as a matter of law." *Deutsch v. Barsky*, 795 A.2d 669, 673 (D.C. 2002) (internal quotation marks omitted). In contract dispute cases such as this one, summary judgment is generally appropriate where an "agreement is unambiguous and where there is no question as to the parties' intent." *Id.* (internal quotation marks omitted). In our jurisdiction—barring "fraud, duress,

---

[5] The final order was signed by a different trial judge (the Honorable Heidi M. Pasichow) because the original trial judge had retired.

or mutual mistake"—generally "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties . . . unless [it] is not susceptible of a clear and definite undertaking." *DSP Venture Grp., Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003). Whether the meaning of a contractual provision is plain is likewise a legal question that we review de novo. *Id.*; *see also Aziken*, 70 A.3d at 219 ("Contracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction. An ambiguity exists when, to a reasonably prudent person, the language used in the contract is susceptible of more than one meaning[.]") (internal quotation marks, brackets, and citations omitted). Lastly, whether a contract provision violates public policy and is thus unenforceable is a legal question that we review de novo. *See Deutsch*, 795 A.2d at 673 (reviewing enforceability of noncompete covenant); *Capital Constr. Co. v. Plaza W. Coop. Ass'n*, 604 A.2d 428, 429–30 (D.C. 1992) (reviewing enforceability of a construction contract for violation of a regulation "enacted to protect the public").

## III. Analysis

On appeal, the firm challenges the trial court's construction of the firm's operating agreement—really a collection of three contracts, (1) the 1996 Operating Agreement, which incorporated in part (2) the 1989 Partnership Agreement, and was later revised by (3) the 1997 Amendment—and the court's ultimate conclusion that

Ms. Gentner is entitled to judgment as a matter of law in her suit to recover her equity interest in the firm.  First, the firm effectively argues that the trial court was wrong to conclude that the starting point for the calculation of Ms. Gentner's adjusted Accrual Basis Account under the operating agreement was the firm's original annual financial statement for 2012, issued in April 2013.  Second, the firm argues that the trial court was wrong to conclude there were no qualifying "events" under the operating agreement necessitating adjustment of Ms. Gentner's Accrual Basis Account.  And third, it argues that the court was wrong to conclude that the forfeiture provision of the amended operating agreement violated Rule of Professional Conduct 5.6(a) and is unenforceable in a court of law.  We address each argument in turn below.

### IV.    The starting point for the calculation of Ms. Gentner's adjusted Accrual Basis Account under the firm's operating agreement.

The firm acknowledges that our analysis must begin with Paragraph 3 of the 1997 Amendment to the firm's 1996 Operating Agreement.  Paragraph 3 identifies the starting point that "shall" be relied on to calculate a departing member's adjusted Accrual Basis Account:  the "*amount set forth in the last annual financial statement for the Company prepared by [its] accountant,* or the last monthly financial statement for the Company prepared by [its] regularly employed bookkeeper,

whichever is later, *prior to the date of the withdrawing Equity Member's notice of withdrawal . . . .*" (emphasis added). This language unambiguously provides that only one financial statement may be used to calculate the baseline Accrual Basis Account—either an annual financial statement or a monthly financial statement, whichever is later. It also unambiguously imposes a bright line temporal restriction on the creation of this financial statement: it must be "prepared . . . prior to the date" a firm member gives notice of withdrawal. Applying this provision in this case, the latest in time financial statement prepared prior to Ms. Gentner's June 17, 2013, notice of withdrawal was, as the trial court correctly determined, the original annual financial statement for 2012, dated April 30, 2013.

The firm provides an "alternate interpretation" for this contractual language and argues that this court "should [] prefer[]" its interpretation over a "literal" understanding of Paragraph 3. The firm explains that the terms "prepared" and "prior to" should be read separately to require that the financial statement (1) be prepared by the firm's accountant and (2) relate to a time period prior to the notice of withdrawal. In this manner, the firm argues that Paragraph 3 does not impose a temporal condition on when a financial statement must come into existence. The firm asserts that Paragraph 3 is more reasonably read in this way, both because this interpretation allows for later correction of errors in a financial statement and

because this interpretation aligns Paragraph 3 with Paragraph 24A of the 1989 Partnership Agreement.

We disagree that Paragraph 3 is reasonably susceptible to the interpretation attributed to it by the firm, much less that it must be read in this manner. Instead we conclude that common sense supports the literal meaning of its plain language. By establishing that a baseline figure must be derived from a financial statement prepared prior to a member's announced departure, Paragraph 3 promotes both certainty and fairness because a financial snapshot is taken at a clear moment in time, when equity members of the firm have a shared interest in accurately reporting the firm's financial health. The alternative is to allow a departing member's Accrual Basis Account to be determined by their former colleagues based on financial statements prepared or revised after they left the firm. But such a process would simply invite the remaining equity members to make unpredictable, self-interested, post hoc changes to the firm's financial statements.

We are unpersuaded by the firm's argument that such post hoc revisions must be permitted under its operating agreement in order to allow for correction of errors in financial statements that go unnoticed until after a member has withdrawn. Presumably, the firm has mechanisms in place and strong incentives to detect and

correct errors before the financial statements are issued; but if it does not, the firm, pursuant to the bright line rule in Paragraph 3, rightly absorbs any loss from errors to its detriment that are later discovered.[6] Moreover, allowing for after-the-fact corrections would give rise to all sorts of questions and inject uncertainty into the calculation of the adjusted Accrual Basis Account that Paragraph 3, read as a whole, plainly seeks to avoid, for example: What kind of errors in earlier generated and approved financial statements could be corrected? How long after the member's departure could they be corrected? How many times could a firm attempt to correct errors? The firm suggests that a court should answer these questions and fill these gaps. But courts generally do not imply terms into an agreement when the contractual language at issue is otherwise clear. *See Bragdon v. Twenty–Five Twelve Assocs. L.P.*, 856 A.2d 1165, 1170 (D.C. 2004). And gap-filling by courts is especially ill-advised when "there is reason to believe that the parties might not have easily reached accord on the critical point." *Aziken*, 70 A.3d at 220 (internal quotation marks omitted).

---

[6] In a declaration submitted to the trial court in support of the firm's motion for summary judgment, named member Harvey Jacobson acknowledged that his "role is . . . to review a draft of the statements prepared by the Firm's Accountants" and that he reviewed the original financial statement for 2012 but failed to "perceive any errors at that time."

Further, we are unpersuaded that we should strain to read Paragraph 3 of the 1997 Amendment to the 1996 Operating Agreement as "paraphras[ing]" Paragraph 24A of the 1989 Partnership Agreement. Although both provisions envision a two-step process for calculating an adjusted Accrual Basis Account, Paragraph 3 takes a different approach from Paragraph 24A. First, Paragraph 24A stated that the starting point would be the last annual financial statement, but it did not specify when the statement had to be prepared. As discussed, Paragraph 3 expressly requires that the financial statement be prepared prior to the notice of withdrawal. Second, Paragraph 24A allowed for adjustments, but it envisioned that the outgoing partner would be able to reach an agreement with their former colleagues if adjustment were necessary. Only in the absence of agreement were the accountants brought in to apply a backward-looking formula relying on the outgoing partner's allocation percentage of profits in prior years. In contrast, Paragraph 3 sets a clear goal of bridging the gap between the last financial statement and the date of withdrawal based on events that affect the firm's financial health in that time period, see *infra* Part III.B.[7]

---

[7] For this reason, we disagree that the two-step process set forth in Paragraph 3 reflects an intent to allow for after-the-fact correction of errors in the initial calculation of the Accrual Basis Account.

Relatedly, we disagree that Paragraph 20 of the 1989 Partnership Agreement supports the firm's argument. Paragraph 20 states that a partner's "withdrawal does

**V.      Qualifying Events for which Ms. Gentner's Accrual Basis Account
could be Adjusted.**

Alternatively, the firm argues that even if the starting point for calculating Ms.
Gentner's equity interest is the original annual financial statement for 2012 dated
April 30, 2013, the Accrual Basis Account in that document must be adjusted
downward, as is authorized by Paragraph 3.  We return to the plain language in this
provision which allows for "adjustments" to the Accrual Basis Account "solely for
events occurring in the period between the closing date of such last financial
statement and the withdrawal date . . . ."  Like the trial court, we conclude that the
firm has identified no event that, pursuant to Paragraph 3, could serve as a basis to
adjust Ms. Gentner's Accrual Basis Account.

We acknowledge at the outset that Paragraph 3 does not define "event."
Looking at the requirement in this clause that "adjustments" be made "solely for"
certain "events," however, we think it plain that an event must bear at least some

---

not relieve [them] from obligations of the Partnership incurred prior to, and still
unpaid at, the time of withdrawal."  But Paragraph 3 of the 1997 Amendment to the
1996 Operating Agreement plainly addresses these obligations, to the extent they are
incurred and unpaid at year's end, in "the last annual financial statement for the
Company prepared . . . prior to the date of . . . notice of withdrawal," and to the
extent that they are incurred after year's end but before withdrawal, in the
adjustments that may be made for qualifying "events."  See *infra* Part III.B.

relationship to the firm's finances, such that it could impact the calculation of the member's Accrual Basis Account. *See 1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984) ("The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms."). Thus, a birthday or a blue moon would not constitute an "event" under Paragraph 3, and we reject the firm's argument that the term "event" should be broadly understood as "something that happens" or "an occurrence." Additionally, Paragraph 3 requires the "event" to occur within a specified time period: between the closing date of the last annual (or monthly) financial statement and the member's actual departure date. Because some amount of time may pass between those two points, this provision allows the firm to pay out the member's equity interest at a level that reflects any changes to the firm's finances leading up to the member's withdrawal.

The firm identifies two "events" that it argues should be considered as bases for "adjustments" under Paragraph 3. The firm first looks to Harvey Jacobson's "discovery" that the April 30, 2013, annual financial statement for 2012 (just like the annual financial statements for prior years) did not account for member bonuses and allowances, prompting the firm to ask its accountants to issue a revised annual

financial statement for 2012 in September 2013.[8]  We cannot agree that this discovery is an "event" contemplated by Paragraph 3.  The firm has never specified exactly when this discovery allegedly took place.  In his declaration submitted to the trial court, Mr. Jacobson stated that he made the realization sometime in "June - July 2013," thus including a timeframe after Ms. Gentner left the firm, whereas the firm's accountant's declaration stated that he was told of the omission in late August 2013, well after her departure.  But the answer to this factual question is immaterial.  To avoid allowing "adjustments" for "events" to serve as a backdoor mechanism for after-the-fact correction of financial reports (which Paragraph 3 does not authorize, see *supra* Part III.A.), the proper focus must be on when the firm incurred and had knowledge of a liability, not when it "discovered" that this liability was omitted from a financial statement.  The firm necessarily knew of these member bonuses and allowances—which totaled $611,654—when it recorded them on a cash basis in 2012, and Mr. Jacobson admitted he knew of them when he approved the original annual financial statement for 2012.  Accordingly, we conclude that the alleged discovery that 2012 bonuses and allowances were omitted from the original annual

---

[8]  It is unclear if the firm raised this issue in the summary judgment proceedings in the trial court.  Again, the firm has not provided us with its filings, but the firm did not seek an express ruling on this theory at that hearing and the trial court did not rule on it.  Because Ms. Gentner has not argued on appeal that we should not consider this "discovery of errors" theory, however, we address it here.

financial report for that year does not constitute an "event" occurring after 2012 and before Ms. Gentner's withdrawal date, within the meaning of Paragraph 3.[9]

The firm also argues that the "mass resignation" of six equity members, including Ms. Gentner, and the related need to write off uncollectible accounts which had inflated the equity interest of all the members of the firm constituted a qualifying event necessitating a downward adjustment of Ms. Gentner's Accrual Basis Account. Again, we cannot agree.

Although some of the equity members announced their intent to withdraw from the firm after Ms. Gentner gave notice and before her actual departure date of June 30, 2013, it is undisputed that none of these equity members actually left the firm before her. One could reasonably expect the eventual departure of these members to have a financial impact on the firm thereafter; but the mechanism set forth in Paragraph 3 for calculating a departing member's adjusted Accrual Basis Account does not permit consideration of such future events. As discussed above, it requires the event to have had an impact on the capital lost or gained by the firm

---

[9] The fact that the firm sought to include these bonuses and allowances in a revised annual financial report for 2012, not in a financial statement for 2013, reinforces this conclusion.

during a particular span of time in the past: after the last annual (or monthly) financial statement and before the date of withdrawal, which in this case was after December 31, 2012, and before June 30, 2013.

The firm argues, however, that the knowledge that some number of equity members in addition to Ms. Gentner were going to leave altered the firm's financial picture because the firm was carrying sizeable uncollectable accounts. The flaw in this argument is that the firm knew about these uncollectible accounts in 2012. In fact, it is undisputed that the firm had disagreed over whether and in what amount to write them off, and it did not collectively resolve this disagreement prior to Ms. Gentner's resignation. Again, we decline to expansively construe the language allowing "adjustments . . . solely for events" to allow post hoc decisions about financial information already known to the firm prior to the relevant time period.[10]

---

[10] In its reply brief, the firm highlights that Paragraph 24A of the 1989 Partnership Agreement expressly requires the firm to deduct doubtful accounts from its financial statements, and argues that this supports a determination that the departure of a number of members of the firm and the related need to write off more than half a million dollars in the subsequent financial statement for the first half of 2013 were properly considered as a basis for a downward adjustment of Ms. Gentner's Accrual Basis Account. This argument, although perhaps alluded to in its summary of argument in its initial brief, is not addressed in any depth in that filing. *Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed

Accordingly, we are unconvinced that Paragraph 3 authorized the firm to wait until a significant number of the equity members left to finally settle—to the remaining members' benefit—the contentious issue of how to account for unpaid work, and then to characterize that self-interested resolution as an "event."

Because the firm has failed to identify a qualifying event for which it could adjust Ms. Gentner's Accrual Basis Account, we affirm the trial court's ruling that there were no triable issues related to the interpretation of "event" and thus no triable issue of fact regarding the need to adjust the Accrual Basis Account value ($141,569) contained in the firm's original annual financial statement for 2012.

---

argumentation" in an initial brief are generally "deemed waived," and "elaboration in the reply brief comes too late") (alteration in original).

In any event, as discussed above, Paragraph 24A set forth a distinct mechanism for calculating a withdrawing partner's adjusted Accrual Basis Account, and we conclude that it was entirely superseded by Paragraph 3 in the 1997 Amendments to the firm's operating agreement. We acknowledge that a federal trial court reached a different conclusion in *Moskowitz v. Jacobson Holman, PLLC*, No. 1:15-cv-336, 2016 WL 356035, at *10 (E.D. Va. Jan. 28, 2016) (reasoning that "Paragraph 24(A) provided the Firm an *independent* basis for the adjustment to its accounts receivable" (emphasis added) and concluding that "there is no need for the Firm to tie the doubtful accounts receivable to an event occurring during the relevant time period"), but we are not bound by that trial court decision and we are unpersuaded by its cursory determination that, because the court could "identify no inconsistency" between the last sentence of Paragraph 24A and Paragraph 3, the last sentence of Paragraph 24A "remains in force." *Id*.

## VI. Rule 5.6(a) and the Law Firm's Forfeiture Provision.

Lastly, the firm argues that the trial court erred in ruling that the forfeiture provision in Paragraph 1 of the 1997 Amendment to the 1996 Operating Agreement violated D.C. Rule of Professional Conduct 5.6(a) and was thus unenforceable. Rule 5.6(a) states, "A lawyer shall not participate in offering or making . . . [a] partnership, shareholders, operating, employment, or other similar type of agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement . . . ." D.C. Rules of Prof'l Conduct R. 5.6(a) (1991). Our court analyzed the scope of this rule's exception for retirement benefits in *Neuman v. Akman*, 715 A.2d 127 (D.C. 1998), but we have never examined the affirmative reach of the rule's prohibition on "restrict[ions]" on "the rights of a lawyer to practice" after terminating an employment relationship. We do so now.

Preliminarily, we consider whether Rule 5.6(a) bars both agreements that place express restrictions on the practice of law and agreements that have that effect, and whether any such restrictions need be absolute or something less. As Comment 1 to the rule explains, the underlying concern of the rule is that an agreement restricting the practice of law "not only limits [a lawyer's] professional autonomy but also limits the freedom of clients to choose a lawyer." *See also Neuman*, 715

A.2d at 130–31; Erika Stillabower, *Speaking of Ethics: A Look at Employment Contracts for Lawyers*, Washington Lawyer, May 2015, at 14 ("At the heart of Rule 5.6 is the fundamental premise that limitations on a lawyer's practice (outside of those inherent in the Rules of Professional Conduct) are bad for lawyers and clients alike, since a smaller pool of available attorneys necessarily limits clients' choice of counsel.") (analyzing D.C. Legal Ethics Comm., Formal Op. 368 (2015)). This concern would be inadequately addressed if only express or absolute restrictions were prohibited.

Comment 2 supports this assessment and a broader reading of the rule. It provides that "[r]estrictions . . . that impose a substantial financial penalty on a lawyer who competes after leaving the firm may violate paragraph (a)." D.C. Rules of Prof'l Conduct R. 5.6(a) cmt. [2] (1991). Additionally, the Legal Ethics Committee of the District of Columbia Bar Association has consistently interpreted Rule 5.6 to preclude not just agreements that explicitly and totally prohibit a lawyer from practicing law when they leave a firm, but also agreements that "create financial disincentives" to competition.[11] And a majority of other jurisdictions that

---

[11] D.C. Legal Ethics Comm., Formal Op. 325 (2004) (reviewing forfeiture of payments in law firm merger agreement and discussing prior ethics opinions); *see also* ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 489 at 5 (2019) (noting that "financial disincentives to a competitive departure have routinely been

have considered this question have likewise concluded that such restrictions violate

their Rule 5.6 equivalent,[12] based on reasoning perhaps best articulated by the New

York Court of Appeals in *Cohen v. Lord, Day & Lord*:

> While a law firm has a legitimate interest in its own survival and economic well-being and in maintaining its clients, it cannot protect those interests by contracting for the forfeiture of earned revenues during the withdrawing partner's active tenure and participation and by, in effect, restricting the choices of the clients to retain and continue the withdrawing member as counsel.

550 N.E.2d at 413 (emphasis and citation omitted).

---

struck down by the courts and criticized in ethics opinions"); *Shainis v. Baraff, Koerner, Olender & Hochberg, P.C.*, 1994 U.S. Dist. LEXIS 21971, at \*7–8 (D.D.C. July 18, 1994) (citing District of Columbia Legal Ethics Committee opinions "prohibit[ing] employment agreements that exact a monetary penalty from a lawyer who enters into competition with a former employer").

[12] *See, e.g.*, *Pettingell v. Morrison, Mahoney & Miller*, 687 N.E.2d 1237, 1238 (Mass. 1997) (invalidating provision requiring forfeiture of "all . . . benefits," including cash profits and annual partnership interest credits); *Whiteside v. Griffis & Griffis, P.C.*, 902 S.W.2d 739, 741–43 (Tex. App. 1995) (invalidating stock agreement provision conditioning payment of good will factor on geographic and time limitations); *Jacob v. Norris, McLaughlin & Marcus*, 607 A.2d 142, 145, 154 (N.J. 1992) (invalidating provision requiring loss of all "termination compensation" except for life insurance benefit); *Cohen v. Lord, Day & Lord*, 550 N.E.2d 410, 410–11 (N.Y. 1989) (invalidating provision requiring forfeiture of all net profits earned during tenure at firm); *Hagen v. O'Connell, Goyak & Ball, P.C.*, 683 P.2d 563, 564–65 (Or. Ct. App. 1984) (invalidating stock valuation provision requiring reduction of share value by 40 percent).

We note that, at least in their initial briefs to this court, the parties assume that a substantial financial penalty will qualify as a restriction that runs afoul of Rule 5.6(a) and largely devote their briefing on this issue to explaining why the forfeiture provision in Paragraph 1 of the 1997 Amendment to the 1996 Operating Agreement should or should not be so characterized.[13]  Accordingly, we hold that an implied, partial restriction on the practice of law, in the form of imposing a substantial financial penalty for representing clients previously represented by the firm, is invalid under Rule 5.6(a), and we turn our attention to considering whether the forfeiture provision in Paragraph 1 functions as a substantial penalty.  We conclude that it does.

To begin, we reject the firm's argument that in assessing substantiality, we should look to the actual impact of this forfeiture provision on a departing lawyer's practice going forward (which in this case would require further factual development precluding summary judgment).  We disagree that Rule 5.6(a) contemplates such an analysis given its prophylactic language prohibiting attorneys from "*offering or making . . . agreement[s]*" that restrict the free movement of lawyers and their

---

[13]  In its reply brief, the firm changes course and argues that "there is good reason to doubt that Rule 5.6(a) even applies to this case," pointing to the fact that Ms. Gentner was able to practice law after her departure.  We decline to address this argument.  *See Comford*, 947 A.2d at 1188.

clients. Looking to the text of Paragraph 1, it requires a partner to forfeit "fifty percent (50%) of his/her [adjusted] Accrual Basis Account" if the partner withdraws from the firm and "takes client(s)" with them. Whatever the outer limit is for a "substantial penalty," we conclude a 50 percent forfeiture of a departing partner's earned equity interest for taking even one client with them falls well within its bounds.

Our conclusion that Paragraph 1 violates Rule 5.6(a) necessarily compels a conclusion that this provision is unenforceable as against public policy,[14] and we reject the firm's argument that we must separately analyze enforceability of this provision. The firm relies on cases where, in other contexts not concerning lawyers, we have addressed the validity of restrictive covenants based on their reasonableness according to certain factors.[15] But we see no need to assess the reasonableness of

---

[14] *Cf. Capital Constr. Co.*, 604 A.2d at 429–30 ("In the District of Columbia, it is a principle of long standing that an illegal contract, made in violation of a statutory prohibition designed for police or regulatory purposes, is void and confers no right upon the wrongdoer." (internal quotation marks omitted)); *see also Moore v. Jones*, 542 A.2d 1253, 1255 (D.C. 1988) (acknowledging a "contract[] may be held invalid if it violates a criminal or regulatory statute").

[15] *See, e.g.*, *Ellis v. James V. Hurson Assocs.*, 565 A.2d 615, 618 (D.C. 1989) (restraints on trade are unreasonable if "(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public" (citing Restatement (Second) of Contracts § 188 (Am. Law Inst. 1981))).

Paragraph 1 under these factors because Rule 5.6(a) itself is a statement of policy approved by this court and it prohibits agreements such as the one at issue here. *See Moskowitz*, 2015 WL 6830266, at *7 ("The clear majority of courts find that a provision that violates Rule 5.6 is unenforceable without requiring any additional showing."). In addition, given that this court interprets and enforces the Rules of Professional Conduct, it would be incongruous for us to recognize on the one hand that Paragraph 1 violates Rule 5.6(a), but simultaneously conclude that it is still enforceable in a civil action.

*            *            *

For the foregoing reasons, we affirm the Superior Court's decision to grant Ms. Gentner summary judgment on her breach of contract claim.

*So ordered.*